UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT

CIVIL ACTION NO. 3:06-36-KKC

MARCUS CAREY,                                                                                    PLAINTIFF,

v.                                          **OPINION AND ORDER**

STEPHEN D. WOLNITZEK,
*in his Official Capacity*
*as Chairperson of the Kentucky Judicial*
*Conduct Commission, et al.*                                                            DEFENDANTS.

* * * * * * * * *

　　　　This matter is before the Court on the Plaintiff, Marcus Carey's, Motion for Preliminary Injunction (Rec. No. 2); the Motion to Dismiss (Rec. No. 21) of the Defendant Linda Gosnell, in her official capacity as Bar Counsel for the Kentucky Bar Association and the Defendants who are members of the Kentucky Inquiry Commission (together the "KBA"); and the Motion to Dismiss (Rec. No. 22) of the Defendants who are members of the Kentucky Judicial Conduct Commission (the "JCC").

　　　　Carey is a candidate for the Kentucky Supreme Court. With his Complaint and Motion for Preliminary Injunction, Carey asks the Court to declare unconstitutional five canons of judicial conduct and a Kentucky statute governing judicial recusal.  For the following reasons, the Motions to Dismiss will be GRANTED in part and DENIED in part and the Motion for Preliminary Injunction will be GRANTED in part and DENIED in part.

I.      **FACTS.**

A.      **The Kentucky Judicial Ethics Regime.**

Section 121 of the Kentucky Constitution provides that, "[s]ubject to rules of procedure to be established by the Supreme Court, and after notice and hearing, any justice of the Supreme Court or judge of the Court of Appeals, Circuit Court or District Court may be retired for disability or suspended without pay or removed for good cause by [the JCC]."  Ky. Const. § 121. Pursuant to its authority to regulate the conduct of the judiciary under Section 121, the Kentucky Supreme Court promulgated the Kentucky Code of Judicial Conduct (the "Code) which is codified at Rule 4.300 of the Rules of the Kentucky Supreme Court ("SCR").

Pursuant to SCR 4.020, the JCC has authority to impose sanctions against any judge or lawyer while a candidate for judicial office who violates the Code and to refer the judge or lawyer to the KBA for possible suspension or disbarment.  The JCC is charged with investigating allegations of judicial misconduct and, where appropriate, with initiating formal proceedings against a judge or judicial candidate.  SCR 4.170.  Pursuant to SCR 4.290, a judge or judicial candidate can seek review of the JCC's final orders with the Kentucky Supreme Court.

Pursuant to SCR 4.310, the Code may be interpreted by an ethics committee of the Kentucky Judiciary (the "Ethics Committee") which can issue informal or formal opinions upon the request of any judge or judicial candidate or on its own motion. These opinions are advisory only.  SCR 4.310.  Any person affected by an opinion of the Ethics Committee can seek review of the opinion by the Kentucky Supreme Court. SCR 4.310.

Pursuant to SCR 3.130(8.2), "a lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct."  The defendant members of the

2

Kentucky Bar Association Inquiry Commission and the Bar Counsel have certain investigative and disciplinary functions over attorneys admitted to practice in Kentucky, including attorneys seeking judicial office. SCR 3.140 *et seq.*

###### B.    Carey's Proposed Communications.

In his Verified Complaint, Carey states that he is a candidate for election to the Kentucky Supreme Court for the Sixth Appellate District of the Commonwealth of Kentucky. (Rec. No. 1, Complaint ¶ 19). He states that he wants to post on his website answers to certain specific questions which he has formulated.  He states he also wants to pose those questions to other judicial candidates. (Rec. No. 1, Complaint ¶ 19).

The specific questions (the "Questions") that Carey wants to ask and answer during his campaign are the following:

1)    Do you believe that a justice of the Kentucky Supreme Court is bound to apply the law according to the contextual interpretation as of the time it was written, including the law as written in the Constitution, or may a justice apply that law according to his/her modern contextual interpretation of that language?  What judicial philosophy do you adopt in interpreting the law, e.g., strict constructionist, originalist, "living document" approach?

2)    When do you believe that human life deserving of the protection of the law, begins?

3)    Do you believe that the rights of the judiciary are limited to those specifically given to it by the express language of the Constitution of Kentucky and the laws as enacted by the legislature?

4)    Do you believe that Kentucky Commonwealth courts possess any "inherent" rights, sometimes referred to as "jural rights"?

5)    Do you believe that "the Best Interest of the Child" is a legitimate consideration  when:

      A.    Terminating parental rights?
      B.    Considering the request for an abortion by a minor?
      C.    In providing legal safeguards for an unborn child in considering the request of an adult for an "elective" or not medically necessary abortion?

6)     What recognition should God properly receive when displaying or discussing an accurate history of the founding principles of American law and justice:

      A.    In Kentucky schools?
      B.    In Kentucky courts?
      C.    In Judicial campaigns?

7)     Do you believe that the Kentucky Constitution recognizes a constitutional right to abortion?

8)     Do you believe that the Kentucky Constitution provides a constitutional right to legally recognized:

      A.    Same-sex marriage?
      B.    Civil unions?

9)     Does the Kentucky Constitution permit the Commonwealth to require that the religious, including Christian, influences on the founding documents of the United States be taught in schools?

(Rec. No. 1, Complaint ¶¶ 19,  21 & Ex. B).

Carey states that he also wants to state his political party affiliation, seek endorsements from other political officials and personally solicit individuals for contributions during his campaign. (Rec. No. 1, Complaint ¶ 20).

**C.    Relevant Provisions of the Code of Judicial Conduct.**

**1)    The Commit Clause.**

Canon 5(B)(1)(c) (the "Commit Clause") of the Code states:

A judge or candidate for election to judicial office. . .shall not intentionally or recklessly make a statement that a reasonable person would perceive as committing

the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court; and shall not misrepresent any candidate's identity, qualifications, present position or other facts.

SCR 4.300, Canon 5(B)(1)(c).

Carey argues that  the Commit Clause is facially unconstitutionally because it is overbroad and vague.  (Rec. No. 1, Complaint ¶¶ 36-39). Carey also argues that the Commit Clause is unconstitutional as applied to him because it prohibits him from answering the Questions.  (Rec. No. 1, Complaint ¶¶  41-44).

    **2)**    **The Recusal Requirements.**

KRS 26A.015 provides that "[a]ny justice or judge. . . shall disqualify himself in any proceeding (a) Where he has. . . expressed an opinion concerning the merits of the proceeding" or "(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned."  Likewise Canon 3(E)(1) of the Code provides that judges must recuse themselves when their "impartiality might reasonably be questioned." SCR 4.300, Canon 3(E)(1)

Carey argues that Canon 3(E)(1) and KRS § 26A.015(2)(e) (together, the "Recusal Requirements") are unconstitutional as applied to him because he is not answering the Questions or announcing his views on disputed legal and political issues because he fears as a justice he will later have to disqualify himself from proceedings related to such issues. (Rec. No. 1, Complaint ¶ 49).

    **3)**    **The Endorsement Clause.**

Canon 5(A)(1)(b) of the Code (the "Endorsement Clause") provides that:

A judge or candidate for election to judicial office shall not. . .make speeches for or against a political organization or candidate or publicly endorse or oppose a candidate for public office. . . ."

SCR 4.300, Canon 5(A)(1)(b).

In a formal opinion, the Ethics Committee answered the following question:

May a judicial candidate use public officials (either current or past) as co-chairpersons for his campaign? Can the same be used as endorsers in newspapers or other advertisements concerning his candidacy?

The Ethics Committee stated:

Judges cannot endorse candidates for public office.  Therefore judges cannot be used as co-chairpersons for a campaign. Endorsements by current public officials who run for office on a partisan ticket would violate the policy of nonpartisan elections in judicial campaigns.

(Rec. No. 1, Complaint, Ex. C).

On April 1, 1998, the Ethics Committee issued Judicial Ethics Opinion JE-93 in which it

answered the following question:

May a judicial candidate state that he or she is endorsed by the Legislative Chairperson of a particular district?

The Ethics Committee gave the following answer:

No. . . The Judicial Ethics Code does not apply to Legislative Chairpersons.  They may do what they want.  A judicial candidate, however, may not advertise the endorsement of a particular Legislative Chair.

(Rec. No. 1, Complaint, Ex. D).

On April 6, 2006, Jean Collier of the Ethics Committee responded to the following question

posed by Carey:

May a Kentucky Judicial candidate or his/her committee publicly identify an "elected official" as:
    a.    Endorsing the election of the judicial candidate, or
    b.    Sponsoring, hosting or otherwise participating in a fundraising event or a reception for the judicial candidate, or
    c.    As a member of the judicial candidate's campaign committee or campaign finance committee?

Collier responded:

6

> Neither the candidate himself, or his committee. . . should solicit the endorsement of a current public official, and such an endorsement, if made, should not be advertised by the candidate's committee or the candidate himself.
>
> Sponsoring, hosting or otherwise participating in a fundraising event or reception is the same as an endorsement.
>
> Being a member of the campaign committee or campaign finance committee is also an endorsement.

(Rec. No. 1, Complaint, Ex. E).

Carey argues that the Endorsement Clause is unconstitutionally vague because it does not adequately define whether a judicial candidate can announce that another public official endorses the candidate. (Rec. No. 1, Complaint ¶ 54). Carey also argues that the Endorsement Clause is unconstitutionally overbroad. (Rec. No. 1, Complaint ¶ 56).

In addition, Carey argues that the Endorsement Clause is unconstitutional as applied to him because he wants to seek the endorsement of various political officials throughout his campaign and because he was unable to allow certain public officials to host a fundraiser for him because he feared it would violate the Endorsement Clause. (Rec. No. 1, Complaint ¶ 59). Carey also argues that the clause is unconstitutionally overbroad and vague as applied to him. (Rec. No. 1, Complaint ¶¶ 60-61).

### 4)   The Solicitation Clause.

Canon 5(B)(2) of the Code (the "Solicitation Clause") provides in pertinent part:

> A judge or a candidate for judicial office shall not solicit campaign funds, but may establish committees of responsible persons to secure and manage the expenditure of funds for the campaign  and to obtain public statements of support for the candidacy.

SCR 4.300, Canon 5(B)(2).

The Ethics Committee issued an advisory opinion JE-92 on April 1, 1998 stating that "[a]

Committee is ...required by the Code if the judicial candidate intends to solicit money." (Rec. No. 1, Complaint, Ex. F).

Carey argues that the Solicitation Clause is overbroad and is not narrowly tailored to serve the state's interest in impartiality. (Rec. No. 1, Complaint ¶¶ 71-72). Carey also argues that the Solicitation Clause is unconstitutional as applied to him because he wants to make personal phone calls and sign letters seeking contributions to his campaign throughout the election cycle but believes that the Solicitation Clause prohibits him from engaging in this activity. (Rec. No. 1, Complaint ¶¶ 75-77).

### 5)      The Partisan Activities Clause.

Canon 5A(2) of the Code provides, in pertinent part, that:

> A judge or candidate shall not identify himself or herself as a member of a political party in any form of advertising or when speaking to a gathering. If not initiated by the judge or candidate for such office, and only in answer to a direct question, the judge or candidate may identify himself or herself as a member of a particular political party.

SCR 5A(2). This is the only portion of Canon 5A(2) challenged by Carey and will be referred to as the Partisan Activities Clause.

On April 30, 2004, the Ethic Committee issued Advisory Opinion JE-105 stating that:

> In accordance with Ky. Const. § 117, judicial elections in Kentucky are nonpartisan. Throughout Canon 5, judges are constrained in their political conduct in an attempt to maintain the nonpartisan character of judicial elections. Judges cannot contribute to political candidates or to a political party and they cannot publicly endorse other candidates for office. While they are permitted to attend political gatherings to campaign on their own behalf, efforts must be made to separate themselves from their surroundings so that an impression is not created that the candidate is there to benefit someone other than himself.

(Rec. No. 1, Complaint, Ex. G).

8

The Committee further opined that the last sentence of the clause should be construed to apply only to one-on-one situations or very small, private, informal groups. "Any other construction would permit partisanship into Kentucky's judicial elections and thereby possibly render this section of the Code unconstitutional by bringing it into violation of Ky. Const. § 117." (Rec. No. 1, Complaint, Ex. G).

Carey argues that the Partisan Activities Clause is unconstitutionally overbroad and is unconstitutional as applied to him because he would like to announce his political affiliation throughout the 2006 campaign. (Rec. No. 1, Complaint ¶¶ 86, 90-91).

By letter dated May 4, 2006, Carey sent a letter to the Ethics Committee requesting a formal advisory opinion regarding whether he could answer the Questions, identify his political party affiliation or seek endorsements from other candidates or elected officials. (Rec. No. 1, Complaint, Ex. A). Carey filed this action on June 9, 2006. By letter dated June 21, 2006, the Ethics Committee informed Carey that, in light of this action, it did not believe it had jurisdiction over the issues raised in Carey's May 4, 2006 letter. (Rec. No. 24, Carey Reply, Ex. 2).

With his Complaint, Carey asks the Court to declare unconstitutional and prohibit the Defendants from enforcing the allegedly offending provisions of the Code and the recusal requirements of KRS 26A.015(2)(e). (Rec. No. 1, Complaint, Prayer for Relief). Contemporaneously with his Complaint, Carey filed a Motion for Preliminary Injunction (Rec. No. 2). The Defendants then filed Motions to Dismiss the Complaint. (Rec. Nos. 21 and 22).[1]

---

[1] As part of its Motion to Dismiss, the JCC argues that the Kentucky Supreme Court is an indispensable party in this action because it promulgated the canons at issue. When a plaintiff challenges the constitutionality of a state statute, the proper defendant is the executive official or agency charged with enforcing the statute, not the legislative body that promulgated the statute. *See McNeilus Truck and Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 437-38 (6th Cir. 2000). Accordingly, the JCC and the KBA, as the parties charged with enforcing the Code, are the proper defendants in this action and the Kentucky Supreme Court is not an indispensable party.

## II.    STANDARDS.

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint should not be dismissed. . . unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322 (1972)(citation omitted). "[T]he factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)).

When deciding whether to issue a preliminary injunction, a district court should balance: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the injunction is not issued; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir.), *cert. denied*, 126 S.Ct. 361 (2005). In First Amendment cases, the first factor will often be determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## III.    ANALYSIS.

### A.    JURISDICTIONAL ISSUES.

#### 1)    Standing.

Carey argues that the Recusal Requirements are unconstitutional as applied to his proposed activity. As to the other provisions, however, he argues that they are both unconstitutional on their face and as applied to his proposed activities. The first issue in this matter is whether Carey has standing to bring these claims. Because standing is jurisdictional, the Court must address this issue

before addressing the merits of Carey's Complaint.

Article III of the U.S. Constitution provides that the subject matter of federal courts is limited to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11ᵗʰ Cir.), *cert. denied*, – U.S. – , 126 S.Ct. 377 (2005). It is "long-settled. . . that standing cannot be inferred argumentatively from averments in the pleadings" but, instead, "must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)(quotations and citation omitted). A federal court presumes that it lacks jurisdiction "unless the contrary affirmatively appears from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991)(quotations and citation omitted). The party seeking federal jurisdiction bears the burden of proving each element of standing. *FW/PBS*, 493 U.S. at 231. The Plaintiff must establish both "constitutional" and "prudential" standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).

**a)      Constitutional Standing.**

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See Id*. at 560-61 (quotations, citations and footnote omitted).

The purpose of this inquiry is to determine whether the parties have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72 (1978)(citation omitted).

**b)**   **Prudential Standing.**

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of State, Inc.*, 454 U.S. 464, 474 (1982).  These principles have developed from "general prudential concerns about the proper – and properly limited – role of the courts in a democratic society." *Duke Power Company*, 438 U.S. at 80 (citations and quotations omitted).  Prudential standing "encompasses the general prohibition on a litigant's raising another person's legal rights, the rules barring adjudication of generalized grievances. . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Elk Grove*, 542 U.S. at 12 (quotations and citation omitted).

Thus, while constitutional standing focuses on whether the plaintiffs have alleged an "injury in fact" that is a sufficiently concrete interest in the outcome of their suit to make it a case or controversy under Article III, prudential standing focuses on whether the plaintiffs are the "proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S.

106, 112 (1976).

c)        The "Overbreadth" Exception to Prudential Standing.

In the First Amendment context, the Supreme Court has recognized an exception to the general rule that a litigant only has prudential standing to vindicate his own constitutional rights. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798-99 (1984). This so-called "overbreadth doctrine" recognizes that "some broadly written statutes may have such a deterrent effect on free expression" that, even where the statute could be constitutionally applied to the plaintiff's conduct, the plaintiff can challenge the statute on the basis that it violates the First Amendment rights of others. *Id.* In the limited area of purported violations of the First Amendment, the Court has permitted plaintiffs to challenge laws " not because their own rights. . . are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

"We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech – especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)**.** The overbreadth doctrine recognizes that "[m]any persons rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech" harming society as a  whole. *Id.*

The overbreadth doctrine, however, has its limits.  In order to ensure that this exception to the ordinary standing requirements "does not swallow the general rule," *Taxpayers for Vincent*, 466 U.S. at 799,  the United States Supreme Court has required that "the overbreadth of a statute must

13

not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. "In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections for parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent*, 466 U.S. at 801.

### d)      The Injury-in-Fact Requirement of Constitutional Standing.

The overbreadth doctrine is only an exception to the prudential standing requirements prohibiting third-party standing.  A plaintiff challenging a statute under the overbreadth doctrine must still establish all of the constitutional standing requirements including an "injury-in-fact." *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 718 (6th Cir. 1995).  Thus, whether Carey has asserted an overbreadth or as-applied challenge to the judicial canons, he must still establish an injury-in-fact as required for constitutional standing.

None of the canons has been enforced against Carey. "In dealing with the chilling effect criminal statutes have on First Amendment expression, the Supreme Court has previously noted that 'it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.'" *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 834 (6th Cir. 2000)(quoting *Steffel v. Thompson,* 415 U.S. 452, 459 (1974)). However, those fears of prosecution cannot be merely 'imaginary or speculative.'" *Id.* (quoting *Younger v. Harris,* 401 U.S. 37, 42 (1971)). For a pre-enforcement challenge to a statute, a plaintiff must  allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute" and "a credible threat of prosecution thereunder." *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).   The threat of injury alleged by a plaintiff must be "'real and immediate,' not 'conjectural' or 'hypothetical.' "

14

*Greater Cincinnati Coalition for the Homeless*, 56 F.3d at 715-16 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983)).

    **2)**      **Ripeness.**

    This court has no jurisdiction over this matter unless it is ripe for judicial review. *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002). "The ripeness doctrine exists 'to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities.'" *Id*. (quoting *Deja Vu of Nashville, Inc. v. Met. Gov't of Nashville*, 274 F.3d 377, 399 (6th Cir. 2001)). The doctrine is designed to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)(internal quotations omitted). While standing deals with whether the plaintiffs are the proper parties to assert a claim, the ripeness doctrine determines whether the claim has been made at the appropriate time.

    "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated at all." *Nat'l Rife Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997). To determine whether a claim is ripe, this Court must consider 1) the likelihood that the injury alleged by the plaintiff will ever occur; 2) whether the factual record is sufficiently developed to allow for adjudication; and 3) the hardship to the parties from refusing consideration. *Norton*, 298 F.3d at 554.

    "For pre-enforcement challenges, a case is ordinarily ripe for review 'only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id*. (quoting *Magaw*, 132 F.3d at 284). "In a First Amendment pre-enforcement challenge, the inquiry usually focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute."

*Id.* The ripeness requirement is somewhat relaxed in First Amendment cases but there must be a credible fear of enforcement. *Id.* "[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Employees Union v. United States,* 101 F.3d 1423, 1428 (D.C.Cir.1996).

In support of their argument that Carey's claims are not ripe for judicial review, the Defendants cite *Kentucky Press Association v. Commonwealth of Kentucky*, 454 F.3d 505 (6th Cir. 2006). In that case, the Kentucky Press Association ("KPA") asserted a facial challenge to four Kentucky statutes, claiming that the statutes denied the media any access to Kentucky's juvenile court proceedings and the records regarding the proceedings in violation of the First Amendment. *Id.* at 507. In actuality, the statutes provided for access to "such persons admitted as the judge shall find have a direct interest in the case or in the work of the court. . . ." *Id.* Further, the statutes actually provided that juvenile records could be disclosed to "persons authorized to attend a juvenile court hearing." *Id.*

The Commonwealth argued that the matter was not ripe for judicial review because the KPA had never petitioned the Kentucky courts for access to juvenile proceedings as, for example, a party with a "direct interest in the case or in the work of the court." *Id.* at 507–08. The government argued that it would be premature for the federal court to assume that the KPA's interpretation of the statutes as denying *all* media access to juvenile proceedings was actually the law. *Id.* at 508.

The Sixth Circuit dismissed the action for lack of ripeness. The Court found that it was "far from certain" whether Kentucky courts would deny the KPA access to juvenile proceedings. *Id.* at 509. The Court determined that the Kentucky courts could reasonably interpret the provisions "to allow for limited access to judicial proceedings by the media, which arguably has a 'direct interest

in the . . .work of the court'" and that "[s]uch an interpretation would transform KPA's constitutional claim, which is based on the assumption that Kentucky denies all media access to its juvenile proceedings, into just the type of 'abstract disagreement[]' that the ripeness doctrine – and more to the point, Article III – prevents us from adjudicating." *Id*. at 509.

The Sixth Circuit determined that, just because court bailiffs and clerks had denied KPA access to juvenile proceedings and records, it did not mean that Kentucky law would not provide for such access if the KPA were to assert such a right in the Kentucky courts, which the KPA had never done. *Id*. at 509-10. The Court found that the factual basis of the KPA's claim was lacking because it had yet to be determined whether "Kentucky law, as interpreted by the Kentucky courts, completely closes juvenile proceedings and records to the media." *Id*. at 510.

**3)** **Carey's Claims.**

**a)** **The Solicitation Clause and Partisan Activities Clauses.**

Carey has standing to assert First Amendment challenges to the Solicitation Clause and the Partisan Activities Clause and these claims are ripe for the Court's review. Carey proposes to engage in precisely the activity prohibited by the plain language of the clauses: personally soliciting contributions and announcing the political party to which he belongs throughout his campaign. Thus, Carey has established a credible threat that he will be sanctioned for engaging in the activities he proposes to engage in; the injury is caused by the prohibitions contained in the Solicitation and Partisan Activities Clauses; and the injury would be redressed if this Court should enjoin enforcement of those clauses.

Further, as to these clauses, the factual record is sufficiently developed to allow the Court to determine the constitutionality of the clauses. No court could reasonably interpret the clauses to

17

permit Carey to personally solicit contributions or announce his political party affiliation in, for example, advertisements or speeches to gatherings. Because Carey has established a direct and immediate threat of sanctions if he were to engage in these activities, it would work a considerable hardship on the parties if this Court should decline to review the clauses to determine their constitutionality. Thus, Carey's challenges to the Solicitation Clause and Partisan Activities Clause are also ripe for this Court's review.

**b)     The Commit Clause.**

In the Commentary to the Commit Clause, the Kentucky Supreme Court states the following:

> Section 5(B)(1)(c) prohibits a candidate for judicial office from intentionally or recklessly making a commitment, or creating the appearance of a commitment, to rule in a certain way on cases, controversies or issues likely to come before the court. The section was changed in 2005 to conform to the United States Supreme Court's holding in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), and the federal district court's holding in *Family Trust Foundation of Kentucky v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D.Ky 2004).
>
> An independent judiciary requires judges to be open-minded, in the sense of not pre-judging matters that might come before them. A candidate who promises the electorate to rule in a certain way on a case or matter is in effect saying to the electorate that the judge is "spoken for' on that matter and will not decide it on the facts and law presented at the time the case arises. The electorate has no legitimate interest in such promises, and candidates may not make them. Candidates may, however, inform the electorate of their judicial and political philosophies and their thinking on points of law so long as the candidates make clear that they will decide matters on the facts and law as presented and developed in the cases that come before them.
>
> The canon applies to those who intend to commit, or create the appearance of a commitment, and those who recklessly create the appearance of a commitment. As used in the canon, recklessly is used as the Supreme Court used the word in *New York Times v. Sullivan*, 376 U.S. 254 and as it is commonly used in the criminal law--a conscious disregard of a substantial and unjustifiable risk that the result will occur. A candidate who make a public statement that the candidate intends to be taken as a commitment (i.e. "If elected I will never probate a defendant in a drug case") violates the canon. In addition a candidate violates the canon if the candidate knows that the statement may reasonably be perceived as a commitment. (cf. *Kirschner v. Louisville Gas & Electric Co.*, 743 S.W.2d 840 (Ky. 1987). However a candidate

who innocently or negligently makes such a statement does not violate the canon. *Summe v. Judicial Retirement and Removal Commission*, 947 S.W.2d 42 (1997), Justice Graves dissenting.

SCR 4.300, Canon 5(B)(1)(c), Commentary.

In *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the United States Supreme Court reviewed a judicial canon stating that a "candidate for a judicial office, including an incumbent judge," shall not "announce his or her views on disputed legal or political issues." *Id.* at 768. The Supreme Court held that the "Announce Clause" violated the First Amendment. *Id.* at 788.

Later, in *Family Trust Foundation of Kentucky v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D.Ky 2004), the district court reviewed a "Pledges or Promises Clause" contained in the Kentucky Code of Judicial Conduct which prohibited judicial candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office." *Id.* at 676. The court also reviewed the prior version of Kentucky's Commit Clause which provided that a judicial candidate "shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." *Id.* The Court held that both clauses violated the First Amendment because they were not "limited to restricting campaign promises to rule a certain way on issues likely to come before the court." *Id.* at 696-97.

As the Commentary to the current Commit Clause makes clear, after *White* and *Family Trust Foundation of Kentucky*, the Kentucky Supreme Court revised the Commit Clause with the intent of making it conform to those decisions. The Commit Clause now prohibits a judge or judicial candidate from "*intentionally* or *recklessly*" making a statement that "a *reasonable person would perceive* as committing the judge or candidate *to rule* a certain way on a case, controversy or issue that is likely to come before the court." SCR 4.300, Canon 5(B)(1)(c)(emphasis added).

19

Thus, whether a candidate's statements will be determined to violate the clause will depend upon the resolution of such issues as whether the candidate intended the statement to be taken as a commitment to rule a particular way on a case and whether a reasonable person would perceive the statement as such a commitment. In other words, whether a candidate's statements will be determined to violate the clause depends almost entirely on an analysis of the particular statement at issue and the context in which it is made.

Carey has, however, never identified any particular statements he intends to make that he believes will subject him to sanctions under the Commit Clause. Instead, Carey has only indicated what questions he would pose to himself and to other candidates. Carey does not face a credible threat of sanctions under the Commit Clause for simply *asking* the Questions. Moreover, Carey does not appear to face any credible threat of sanctions for *answering* at least some of the Questions. According to the Kentucky Supreme Court's commentary to the Commit Clause, Carey can state his judicial and political philosophies and his "thinking on points of law." Thus, there does not appear to be any likelihood that Carey will be sanctioned for stating his judicial philosophy in interpreting the law (Proposed Question 1) or what he believes the "rights of the judicary" are (Proposed Questions 3 and 4). This is true no matter how Carey phrases his statements regarding these issues.

Carey, however, also proposes to answer questions posed by himself regarding when he believes human life begins as a legal matter (Proposed Question 2); whether he believes the "best interest of the child" is an appropriate consideration in particular contexts (Proposed Question 5); what recognition God should receive when displaying or discussing the history of the founding principles of American law and justice (Proposed Question 6 ); and whether there is a constitutional

20

right to abortion or gay marriage under the Kentucky Constitution (Proposed Questions 7 and 8).

In response Carey's proposed Question No. 2, Carey could state, "I personally believe that human life deserving of legal protection begins at conception but, as a Kentucky Supreme Court justice, I would not decide cases based on my personal beliefs and would follow the law as established by the Supreme Court if such an issue were to come before me as a justice." If he were to answer the question in that manner, the Kentucky Supreme Court could determine that the statement could not reasonably be perceived as a "commitment" to rule a particular way in a case. On the other hand, in response to the Question, Carey could state, "I personally believe that human life deserving of legal protection begins at conception and, if this issue should ever come before me, would vote to overturn any precedent to the contrary." It is likely that the Kentucky Supreme Court would determine that such a statement is a "commitment" to rule a particular way.

Likewise, if, in response to proposed Question Nos. 7 and 8, Carey were to state, "I believe there is a constitutional right to gay marriage and abortion under the Kentucky constitution and would rule that way if these matters were ever to come before me no matter what prior courts have decided," the Kentucky Supreme Court would likely determine that the statement violates the Commit Clause.  If, on the other hand, Carey were to state, "I believe there is a constitutional right to gay marriage and abortion under the Kentucky constitution but also believe in the legal principle of *stare decisis* and would follow that principle in deciding issues before me," the Kentucky Supreme Court could determine that such a statement is more ambiguous and not a "commitment" to rule a particular way in a case likely to come before the Court.

There are of course, an infinite number of ways in which Carey could answer his Questions. Without knowing what particular statements Carey intends to make in response to his Questions, this

21

Court cannot find that he faces a credible threat of sanctions under the Commit Clause for making the statements. Carey has not even made a general allegation that he intends to make statements that would violate the Commit Clause. Instead, he simply alleges that he intends to answer the Questions.

This Court cannot find, however, that Carey faces a credible threat of prosecution simply because he intends to answer the Questions. This is especially true given that the Kentucky Supreme Court has yet to issue any opinions interpreting the current Commit Clause. For the same reasons, Carey has not established the likelihood that he will be sanctioned under the Commit Clause as required under the ripeness doctrine. As in the *Kentucky Press Association*, it is far from certain that the Kentucky Supreme Court would sanction Carey for answering the Questions. The threat of any such sanction depends entirely upon *how* Carey answers the Questions. In *Kentucky Press Association*, the Sixth Circuit at least knew the precise nature of the proposed activity which the KPA claimed was prohibited under the statutes at issue. While here, Carey has set forth the Questions he would like to ask, he has not explained the answers he would like to give. However, it is the answers rather than the questions that may subject Carey to sanctions under the Commit Clause. Therefore, because the content of those answers is unknown, Carey's challenge to the Commit Clause is not ripe for judicial review.

In other cases in which courts have specifically held that a plaintiff had standing to challenge a Commit Clause, the plaintiffs were individuals or groups who alleged that they had been injured because the candidates had refused to provide them certain information due to the Commit Clause. The non-candidate plaintiffs thus had suffered an "informational injury." *See Family Trust Foundation of Kentucky*, 345 F.Supp.2d at 685-86; *North Dakota Family Alliance, Inc. v. Bader*, 361 F.Supp.2d 1021, 1033 (D.N.D. 2005). *But see Wells v. Hardin*, 2006 WL 1586565 (E.D. La.

2006)(judicial candidate does not have standing to challenge clause).

In this case, there are no plaintiffs alleging an "informational injury." Carey must establish that he himself has standing to challenge the Commit Clause.  The Court recognizes that Carey argues that his injury consists of the fact that he has been chilled from answering the questions in *any* form because he fears he will be deemed to have violated the clause no matter what answer he gives. The problem, however, is that in order to establish standing and ripeness, Carey must allege something more than that he has a subjective fear of answering the Questions. This Court must find a credible, objective threat that Carey will be sanctioned for answering the Questions.  Where a plaintiff challenges a statute on First Amendment grounds, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972); *Bigelow v. Virginia*, 421 U.S. 809, 815-17 (1975).

This Court has not found any case where a court has found that a plaintiff faced a credible threat of sanctions under a statute for engaging in an activity without knowing the activity in which the plaintiff proposed to engage. This Court simply cannot find that Carey has any credible fear of sanctions for answering the Questions without knowing the answers that Carey intends to give. Accordingly, Carey has no standing to challenge the Commit Clause and this challenge is not ripe for judicial review.

### c) The Endorsement Clause.

Carey proposes to solicit public officials to endorse his candidacy for Supreme Court justice. The language of the Endorsement Clause does not prohibit Carey from engaging in this activity. Instead, the clause only prohibits Carey from endorsing or opposing another candidate for public office.  Thus, looking just to the language of the clause, Carey does not have an objectively

reasonable fear of sanctions if he solicits the endorsement of public officials.

Nevertheless, as explained above, in a formal opinion, the Ethics Committee has stated that "[e]ndorsements by current public officials who run for office on a partisan ticket would violate the policy of nonpartisan elections in judicial campaigns." And, more recently, on April 6, 2006, a representative of the Ethics Committee sent Carey an e-mail stating that neither the candidate nor his committee should solicit the endorsement of a current public official and that a public official participating in a fundraiser for the judicial candidate is the same as an endorsement of the candidate. (Rec. No. 1, Complaint, Ex. E).

In considering the issues of standing and ripeness, it is important to note that the Ethics Committee has no authority to enforce the Code. Its authority is limited to interpreting the Code through informal and formal advisory opinions. Even assuming that the e-mail sent by the Ethics Committee representative rises to the level of an "informal advisory opinion," the Ethics Committee's advisory opinions are not binding on the JCC, which enforces the Code. Carey has pointed to no instances where the JCC actually charged or sanctioned a judicial candidate for seeking the endorsement of public officials or any other evidence that the JCC intends to enforce the clause in that manner.

While the formal opinion and e-mail by the Ethics Committee suggest that Carey cannot seek endorsements from public officials, the formal opinion and e-mail do not determine the enforcement policy of the JCC or the KBA. Any person affected by an opinion of the Ethics Committee can seek review of the opinion by the Kentucky Supreme Court. Carey, however, never sought review by the Kentucky Supreme Court of the opinions upon which he now relies. Instead he filed an action in this Court.

24

Because the Endorsement Clause does not prohibit the activity in which Carey proposes to engage and because the Ethics Committee has no power to enforce the Code, the advisory opinion and e-mail do not establish that the probability of Carey being sanctioned for soliciting endorsements is so substantial or imminent that this matter must be resolved by an injunction prohibiting such an enforcement.

Carey cannot establish an intent to engage in a course of conduct proscribed by the Endorsement Clause because he has failed to show that the clause proscribes the activity in which Carey proposes to engage, i.e., soliciting the endorsement of public officials. While that issue is unresolved, Carey cannot establish an objectively real, immediate or credible threat of sanctions for soliciting the endorsement of public officials. Accordingly, for his challenge to the Endorsement Clause, Carey has failed to establish the requisite injury required to satisfy the standing or ripeness doctrines.

Furthermore, the factual record is not sufficiently developed to permit adjudication of Carey's challenge to the constitutionality of the Endorsement Clause. It is, of course, true that  the issue of whether a prohibition against judicial candidates seeking endorsements from public officials violates the First Amendment is a purely legal issue.  Nevertheless,  this Court cannot resolve that legal issue until a threshold factual issue is resolved, i.e., whether the Endorsement Clause actually prohibits a judicial candidate from seeking endorsements from public officials.

In failing to determine whether the Kentucky Supreme Court actually interprets the Endorsement Clause to prohibit such solicitations, Carey prevented the formation of a concrete case or controversy regarding whether any such prohibition would be constitutional.  As in the *Kentucky Press Association* case, it is far from certain whether the Kentucky Supreme Court would determine

25

that the Enforcement Clause prohibits the solicitation of endorsements of public officials. *Kentucky Press Association*, 454 F.3d at 509.  In the *Kentucky Press Association*, the Sixth Circuit determined that the case was not ripe for review because the Kentucky courts could "reasonably interpret" the provisions at issue in a way that would moot the constitutional issue. *Id*.  In this case, looking to the language of the clause, it cannot reasonably be interpreted to prohibit the activity that Carey seeks to engage in.  Thus, it is highly likely that the Kentucky Supreme Court would interpret the clause in a way that would moot the constitutional issue raised by Carey. Regardless of how the Kentucky Supreme Court might eventually interpret the clause, however, Carey's challenge to the Endorsement Clause is not ripe for this court's review.

> d)     **The Recusal Requirements.**

As to the Recusal Requirements, Carey argues that there is a credible threat that he will be required to recuse from certain cases if he answers the Questions.  Carey only challenges the Recusal Requirements as they apply to his answers to the Questions.  The Court finds that Carey lacks standing to challenge the requirements for several reasons.  First, the requirements require recusal where a judge or justice's "impartiality might reasonably be questioned." An initial problem is, again, that Carey has not offered the statements he intends to make that might cause him to recuse from certain cases if he is elected justice.  Without knowing the content of Carey's proposed statements,  the Court is unable to determine whether Carey has a reasonable fear that making the statements will force him as a justice to recuse from certain cases pursuant to the Disqualification Requirements.

Further, by its plain language, the Recusal Requirements pertain only to justices and judges. Carey is not a judge or justice.  Carey argues, however, that his speech is currently chilled because

he fears that, *if* he answers the Questions and *if* he is elected justice, and *if* certain cases come before the Court, and *if*, as a result of his answers to the Questions, Carey's impartiality might reasonably be questioned, *then* he will be required to recuse from those cases. Thus, determining that Carey has established a current injury-in-fact as a result of the Recusal Requirements would require the Court to engage in a series of conjectures and hypotheticals regarding the content of the statements he intends to make during the campaign, the types of cases that would come before him if he is elected justice and whether the Kentucky Supreme Court would determine that Carey's impartiality could be reasonably questioned in those cases as a result of the unknown statements.

Because Carey has not established a real or immediate threat of sanctions under the Recusal Requirements, there is no an injury-in-fact sufficient to provide him with standing to challenge the requirements. Moreover, he has failed to develop a sufficient factual record that would enable the court to make a judicial determination regarding the constitutionality of the Recusal Requirements as applied to Carey's answers to the Questions. Thus, this matter is not ripe for judicial review.

Finally, though no party has addressed this issue, the Court questions whether recusal is actually a sanction for engaging in speech. Judges are often required to recuse from cases. Recusal may be required because of such benign activity as the judge's past law practice, the judge's financial investments or the judge's relationship with a certain party. In these situations, recusal is not a punishment or sanction for engaging in the activities that caused recusal. Likewise, where a judge is mandated to recuse from a particular case because of past public statements, the Court does not believe that the mandated recusal is a punishment for the speech. Accordingly, the Court questions whether Carey could establish any "injury" as a result of the Recusal Requirements, even if the Court were to determine in this action that, as a result of his unknown answers to the Questions, Carey

would likely be required to recuse from certain cases if he is elected as Supreme Court justice.

**B.    ABSTENTION.**

Thus, the sole challenges properly before this Court are Carey's challenges to the Solicitation Clause and the Partisan Activities Clause. The KBA has argued that this Court should abstain from this matter under *Younger v. Harris*, 401 U.S. 37 (1971) and, possibly, *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).

The KBA argues that, with his letter of May 4, 2006, in which Carey asked the Ethics Committee for a formal advisory opinion, he initiated a "state proceeding" and that this Court should abstain from adjudicating Carey's claims until the Ethics Committee has issued an advisory opinion and the Kentucky Supreme Court has authoritatively construed the provisions at issue pursuant to Supreme Court Rule 4.310.

However, abstention under *Pullman* is not warranted unless the provision being challenged is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *City of Houston, Texas v. Hill*, 482 U.S. 451, 468 (1987)(quotations and citation omitted). "Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Id*. (quotations and citation omitted). This is true even if the state courts have never interpreted the statute. *Id* at 469.

The Partisan Activities Clause unambiguously prevents a judicial candidate from "identify[ing] himself or herself as a member of a political party in any form of advertising or when speaking to a gathering." Likewise, the Solicitation Clause unambiguously provides that a judge or judicial candidate "shall not solicit campaign funds." Neither defendant has argued that these clauses should be construed in any other manner. Nor could the clauses be construed in any other

manner than to prohibit a judge from soliciting campaign funds and from identifying himself as a member of a political party.  Accordingly, abstention under *Pullman* is not appropriate.

Under *Younger*, abstention is required where there is a  state proceeding that is currently pending which involves an important state interest and affords the plaintiff an adequate opportunity to raise constitutional claims. *Coles v. Granville*, 448 F.3d 853, 865 (6th Cir. 2006). Here, however, there is no pending state proceeding.  There are no disciplinary proceedings pending against Carey and Carey's request for a formal advisory opinion was effectively denied by its letter dated  June 21, 2006 when the Ethics Committee stated it no longer had jurisdiction over this matter.  Because there is no pending state proceeding, *Younger* abstention is not appropriate.

### C.   WHETHER THERE IS A STRONG LIKELIHOOD THAT THE PROVISIONS VIOLATE THE FIRST AMENDMENT.

#### 1)   The Proper Standard.

Speech during an election campaign "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995). The proper test to be applied to determine the constitutionality of restrictions on "core political speech" is strict scrutiny. *Id.* at 347.  The Partisan Activities Clause and the Solicitation Clause restrict candidates' speech during elections.  Further, the restrictions are content-based, applying only to particular kinds of messages, i.e., speech identifying political party affiliation and speech requesting campaign contributions. A content-based regulation is subject to the highest degree of constitutional scrutiny. *Grider v. Abramson*, 180 F.3d 739,748 (6th Cir. 1999).

Thus, the prohibitions against political party identification and direct solicitations are subject to strict scrutiny review. Under strict scrutiny analysis, the government has the burden of proving

that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *White,* 536 U.S. at 774-75. "[I]t is the rare case in which ⋯ a law survives strict scrutiny." *Burson v. Freeman,* 504 U.S. 191, 211 (1992).

### 2)   Solicitation Clause.

The Defendants argue that the Solicitation Clause serves the compelling state interest of ensuring the judiciary's actual impartiality to parties and the appearance of impartiality to parties. (Rec. No. 18, JCC Response at 25; Rec. No. 19, KBA Response at 29). The Defendants may argue that the Solicitation Clause serves this interest because it prevents judges from actually favoring those parties who contribute money to their campaigns. Even with the prohibition against direct solicitations, however, judges are able to find out who contributed to their campaigns and the amounts they contributed. Thus, if a judge is predisposed to favoring those parties who agree to make contributions, the Solicitation Clause's prohibition against personal solicitation does not prevent such actual partiality.

Additionally, the clause does not serve the state's interest in preserving the appearance of judicial impartiality. If the public does not believe that elected judges favor their contributors, then the committee serves no purpose in preserving that appearance of impartiality. If, on the other hand, the public believes that elected judges favor their contributors, then the fact that contributions are solicited by a committee instead of the judge himself does nothing to dispel that perception. In fact, many members of the general public are likely unaware that judges are not permitted to personally solicit contributions to their campaigns. Those who are aware of the prohibition are likely also aware that, despite the prohibition, judges can still find out who contributed to them and who did not. Thus, the ban on personal solicitation does nothing to preserve the appearance of judicial

30

impartiality.

The Defendants argue that the ban on personal solicitation of contributions serves the state's interest in protecting the actual and apparent impartiality of judges because it precludes one-on-one contact between the judge and potential donor. The JCC argues that the prohibition against personal solicitation "preclude[s] the potential intimidation of the direct solicitation." (Rec. No. 18, JCC Response at 25). The KBA further asserts that it is the "direct contact between the candidate and potential donors that is the problem" because this is the moment when "the coercive effect" of the solicitation is "at its most intense." (Rec. No. 19, KBA Response at 30).

This Court finds no compelling state interest in prohibiting speech that makes it easier for potential donors to "just say no." While such a prohibition may reduce the solicitee's discomfort in refusing a personal solicitation, it does not prevent the judge from identifying those who refuse to contribute to his campaign. Because non-contributors can easily be identified either directly by committee members or indirectly through a process of elimination, a solicitee's fear of disfavor cannot be significantly reduced by solicitations through committees rather than by candidates.

Furthermore, it cannot be said that the ban on direct solicitations reduces the potential for corruption because it eliminates that moment when a judicial candidate can say, "contribute money to my campaign and I will rule in your favor" or "if you don't contribute to me, I'll never rule in your favor." It is true that requiring a committee to solicit campaign contributions prohibits such direct shakedowns by a corrupt judicial candidate. Such blatantly corrupt activity, however, is most certainly already prohibited by the Canon requiring that a judge or judicial candidate "maintain the dignity appropriate to judicial office" as well as by various criminal statutes. SCR 4.300, Canon 5(B)(1)(a). Further, if the provision is aimed at preventing direct solicitations that amount to

31

extortion, then the prohibition against all personal solicitations for campaign contributions is overbroad.

Because the Solicitation Clause does not serve the state's interest in preserving the actual or apparent impartiality of the elected judiciary, the clause is unconstitutional.

### 3) Partisan Activities Clause.

In *White*, the Supreme Court recognized three definitions for judicial "impartiality." The Court held that judicial impartiality, meaning the lack of bias for or against either party to the proceeding and the appearance of the same, was a compelling state interest. 536 U.S. at 775-76. The Court further determined, however, that Minnesota's Announce Clause did not serve that interest because it did not restrict speech for or against particular *parties*, but instead only restricted speech for or against particular *issues*. *Id*. at 776. The Court also determined that judicial impartiality could mean the "lack of preconception in favor of or against a particular *legal* view." *Id.* at 777. In the Supreme Court's view, this was not a compelling state interest, however, because it is "virtually impossible to find a judge who does not have preconceptions about the law." *Id.*

The Supreme Court also recognized a third possible meaning of "impartiality" as "open-mindedness," meaning a judge's "willing[ness] to consider views that oppose his preconceptions." *Id*. at 778. The Court did not state whether it found this form of impartiality a compelling state interest because it determined that the Announce Clause was not adopted for the purpose of preserving judicial open-mindedness or the appearance of the same. *Id.* The state had argued that the clause served this interest because it relieved a judge from the pressure to rule a certain way in order to maintain consistency with his prior statements. *Id*. at 778-79. The Court determined that, if the Announce Clause was aimed at that purpose, it was "woefully underinclusive" because it only

32

prohibited statements made in election campaigns but not any statements that judges may have made before arriving on the bench or while on the bench. *Id*. at 779-80.

On remand from the Supreme Court, in *Republican Party of Minnesota v. White (White II)*, 416 F.3d 738 (8th Cir. 2005), *cert. denied, Dimick v. Republican Party of Minn.*, 126 S.Ct. 1165 (2006), the Eighth Circuit considered the constitutionality of the state's Partisan Activities Clause which provided that  judicial candidates could not "identify themselves as members of a political organization, except as necessary to vote in an election. . . attend political gatherings; or seek, accept or use endorsements from a political organization." *Id*. at 745.  The court determined that the clause was not narrowly tailored to serve the state's interest in preventing judicial partiality toward *parties* inasmuch as it was aimed at keeping judges from aligning with particular *views* on issues by keeping them from aligning with a particular political party associated with those views. *Id*.  at 754. In *White*, as stated, the Supreme Court had determined that preventing a judge's alignment with particular views was not a compelling state interest. The Eighth Circuit further determined that, even where the political party was a litigant before a judge, a judge's impartiality could not be questioned simply because he was a registered member of that political party or an opposing one.  *Id*. at 755.

As the Supreme Court had done in *White I*, the Eighth Circuit rejected the argument that the clause was intended to serve the state interest in judicial "open-mindedness."  *Id*. at 756.  The Court determined that the clause was "woefully underinclusive" if open-mindedness was the intended interest because it only prohibited a judicial candidate from associating with a political party during a campaign, "after a lifetime of commitment to that party." *Id*. at 758. "The few months a candidate is ostensibly purged of his association with a political party can hardly be expected to suddenly open the mind of a candidate who has engaged in years of prior political activity."  *Id*. at 758.

Further, as to the state's interest in preserving the *appearance* of judicial open-mindedness, the Court held that the clause was even less tailored to serving this interest because, "[i]f, as the Supreme Court [in *White I*] has declared, a candidate may *speak* about her views on disputed issues, what appearance of 'impartiality' is protected by keeping a candidate from simply *associating* with a party that espouses the same or similar positions on the subjects about which she has spoken?" *Id*. "Moreover. . . cabining a candidate from a political party for the relatively short duration of a campaign would add nothing to an appearance of impartiality." *Id*. at 758.  Thus, the Eight Circuit determined, it was clear that judicial open-mindedness was not the purpose for the clause at issue. *Id*.

The Eighth Circuit went on to determine that judicial "open-mindedness" was not truly a compelling state interest because the state had not "bothered to enact a regulation that guards the interest from all significant threats." *Id*. at 759.  The Court noted that the clause only restricted judicial candidates' activities with political parties and that a judicial candidate's association with interest groups would work just as much damage to a judicial candidate's impartiality or appearance of impartiality.  *Id*. Because the clause still permitted "appreciable damage" to the judiciary's openmindness and appearance of the same, the Court rejected the suggestion that the state could view that interest as one of the "highest order."  *Id*. at 760

Based on the evidence before this Court and for many of the same reasons detailed in *White II*, this Court would also have to conclude that the Partisan Activities Clause does not serve the interest of judicial impartiality or the appearance of judicial impartiality.  The clause does not restrict speech for or against particular litigants, but only restricts speech identifying a judicial candidate as a member of a political party. To the extent that the prohibition is intended to prevent partiality

34

toward a particular legal view or the appearance of such partiality, under *White I*, this Court cannot find a compelling state interest. Finally, if the goal is to ensure judicial open-mindedness and the appearance of the same, the clause is underinclusive. It merely prohibits a judicial candidate from identifying his political party and does nothing toward assuring the actual open-mindedness of the candidate.

As to the appearance of open-mindedness, the clause only prohibits the candidates from identifying their political party during the campaign. The political party affiliations of many candidates, however, are well known prior to the election. Even during and after the election, the political party affiliation of all candidates is readily discoverable through public records. Further, the clause permits a candidate to state his political party affiliation when asked. Thus, the clause does not nothing toward ensuring the apparent open-mindedness of the judiciary.

In attempting to justify the Partisan Activities Clause on the basis of a state interest in judicial impartiality, the Defendants also argue that the clause serves the state's interest in nonpartisan elections as mandated by the state constitution and the state's interest in preserving the actual and apparent independence of judges. The Defendants do not, however, explain what they mean by "nonpartisan" election or judicial "independence."

If a "nonpartisan" election simply means an election in which the candidates are not nominated by political parties and their political party affiliation does not appear beside their name on the ballot, preventing a judicial candidate from revealing his political party clearly does not serve this interest. Permitting a candidate to reveal his political party in advertisements, speeches and discussions will not change the nominating structure of the election or appearance of the ballot. If a "nonpartisan" election means an election in which no one knows the political party affiliation of

35

the candidate, then the Partisan Activities Clause is woefully underinclusive because, as explained above, the political party of the candidate is a matter of public record and is easily discoverable by various means including asking the candidate.  If a "nonpartisan" election means an election in which the political parties do not fund or endorse a candidate, the Partisan Activities Clause is not tailored to prevent that activity at all.  The Court notes that the clause goes further than simply preventing a candidate from revealing his political party in a manner that implies that party's endorsement. Instead, it  broadly bars a candidate from identifying his political party in even the most casual of circumstances unless he is asked.

For the same reasons, the Court concludes that the Partisan Activities Clause is not narrowly tailored to serve the state's interest in preserving the independence of the judiciary from political parties or the appearance of the same. If the actual or apparent independence of the judiciary is preserved when noone knows the political party affiliation of the candidate, then the Partisan Activities Clause is woefully underinclusive because the political party of the candidates is easily discoverable and often widely known.  If the actual or apparent independence of the judiciary is preserved when political parties are prevented from funding or endorsing judicial candidates, the Partisan Activities Clause does not prevent that activity at all.

For all these reasons, the Partisan Activity Clause's prohibition against a candidate revealing his political party affiliation is not narrowly tailored to serve a compelling state interest and is, therefore, unconstitutional.

### D.  OTHER FACTORS ON MOTION FOR PRELIMINARY INJUNCTION.

It is "well-settled precedent" that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" *See G & V Lounge, Inc. v. Michigan*

*Liquor Control Comm'n*, 23 F.3d 1071, 1078 (6th Cir. 1994). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1079. Finally, "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoyment." *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville and Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001). Because Carey has established a strong likelihood of success on the merits on his First Amendment challenge to the Partisan Activities Clause and the Solicitation Clause, the Court finds that he would suffer irreparable injury if the injunction requested in this case were not issued; the injunction would not cause substantial harm to others; and the public interest will be served by issuance of an injunction enjoining enforcement of these clauses.

## IV.   CONCLUSION.

For the above reasons, the Court hereby ORDERS as follows:

1)   The Motions to Dismiss (Rec. Nos.21 and 22) are GRANTED in part and DENIED in part. The motions are GRANTED as to Carey's challenge to the Commit Clause, the Endorsement Clause and the Recusal Requirements and those claims are hereby DISMISSED without prejudice for lack of subject matter jurisdiction. The Motions to Dismiss are DENIED with regards to Carey's challenge to the Partisan Activities Clause and the Solicitation Clause.

2)   The Motion for Preliminary Injunction (Rec. No. 2) is GRANTED in part and DENIED in part. The Motion for Preliminary Injunction is GRANTED as to the Partisan Activities Clause and the JCC and the KBA are hereby ENJOINED from enforcing that clause. The Motion for Preliminary Injunction is GRANTED as to the Solicitation Clause and the JCC and the KBA are hereby ENJOINED from enforcing that clause. The Motion for Preliminary Injunction is otherwise DENIED.

This the 10th day of October, 2006.



**Signed By:**

*__Karen K. Caldwell__*

**United States District Judge**