UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 3:06-36-KKC

MARCUS CAREY,                                                             PLAINTIFF,

v.                          **OPINION AND ORDER**

STEPHEN D. WOLNITZEK,
*in his Official Capacity*
*as Chairperson of the Kentucky Judicial*
*Conduct Commission, et al.*                                       DEFENDANTS.

* * * * * * * * *

This matter is before the Court on cross-Motions for Summary Judgment (Rec. Nos. 81 and

93).   For the following reasons, the Court will GRANT the Plaintiff's Motion for Summary

Judgment (Rec. No. 81) in part and DENY the motion in part; and will GRANT  in part and DENY

in part the Motion for Summary Judgment (Rec. No. 93) by the Defendants associated with the

Kentucky Bar Association.[1]

## I.    BACKGROUND.

The Plaintiff, Marcus Carey is an attorney and, at the time he filed his Complaint and Motion

for Preliminary Injunction in this matter, was a candidate for the Kentucky Supreme Court. With his

Complaint and Motion for Preliminary Injunction, Carey asked the Court to declare unconstitutional

five provisions of the Kentucky Code of Judicial Conduct (the "Code") and a Kentucky statute

governing judicial recusal. These provisions have been denominated the Commit Clause,[2] the

---

[1] The Court has reviewed the parties' pleadings and finds no hearing on this matter is necessary.
Accordingly, the Plaintiff's Motion for Hearing (Rec. No. 98) will be denied.

[2] The Commit Clause states the following:
A judge or candidate for election to judicial office. . .shall not intentionally or recklessly make a statement
that a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case,

Recusal Requirements,[3] the Endorsement Clause,[4] the Solicitation Clause,[5] and the Partisan Activities Clause.[6]

Specifically, Carey asked the Court to declare that the judicial clauses and the Kentucky statute violated the First Amendment to the United States Constitution which provides that "Congress shall make no law. . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I..

Contemporaneously with his Complaint, Carey filed a Motion for Preliminary Injunction (Rec. No. 2). The Defendants[7] then filed Motions to Dismiss the Complaint. (Rec. Nos. 21 and 22).

---

controversy, or issue that is likely to come before the court.
Rule 4.300 of the Rules of the Kentucky Supreme Court ("SCR"), Canon 5(B)(1)(c).

[3] KRS 26A.015 provides that "[a]ny justice or judge. . . shall disqualify himself in any proceeding (a) Where he has. . . expressed an opinion concerning the merits of the proceeding" or "(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned." Likewise Canon 3(E)(1) of the Code provides that judges must recuse themselves when their "impartiality might reasonably be questioned." SCR 4.300, Canon 3(E)(1). Together these are the "Recusal Requirements."

[4] The Endorsement Clause provides that:
A judge or candidate for election to judicial office shall not. . .make speeches for or against a political organization or candidate or publicly endorse or oppose a candidate for public office. . . ."
SCR 4.300, Canon 5(A)(1)(b).

[5] The Solicitation Clause provides that:
A judge or a candidate for judicial office shall not solicit campaign funds, but may establish committees of responsible persons to secure and manage the expenditure of funds for the campaign  and to obtain public statements of support for the candidacy. SCR 4.300, Canon 5(B)(2).

[6] The Partisan Activities Clause provides that:
A judge or candidate shall not identify himself or herself as a member of a political party in any form of advertising or when speaking to a gathering.  If not initiated by the judge or candidate for such office, and only in answer to a direct question, the judge or candidate may identify himself or herself as a member of a particular political party.  SCR 4.300, Canon 5A(2).

[7] Defendants are members of the Kentucky Judicial Conduct Commission (the "JCC") and Linda Gosnell, in her official capacity as Bar Counsel for the Kentucky Bar Association and members of the Kentucky Inquiry Commission (together the "KBA").
Pursuant to SCR 4.020, the JCC has authority to impose sanctions against any judge or lawyer while a

On October 10, 2006, this Court entered an Opinion and Order (Rec. No. 35) which dismissed Carey's challenges to the Commit Clause, the Endorsement Clause and the Recusal Requirements for lack of ripeness and standing.  The Court denied the Motions to Dismiss Carey's challenges to the Partisan Activities Clause and the Solicitation Clause.  The Court further determined that Carey had established a likelihood of success on the merits of his challenges to the Partisan Activities Clause and the Solicitation Clause and granted Carey's Motion for a Preliminary Injunction as to these clauses.

Carey then filed an unopposed motion to amend his Complaint in which he attempted to reassert challenges to the Commit Clause, the Recusal Requirements, and the Endorsement Clause. The Court granted the motion to amend and the Defendants then moved to dismiss (Rec. Nos. 53 & 54) Carey's challenges to the these clauses contained in the Amended Complaint.

In the Amended Complaint (Rec. No. 51), Carey brought both as-applied and facial challenges to the Commit Clause.  In its ruling on the Defendants' Motions to Dismiss (Rec. No. 75), the Court dismissed the as-applied challenge to the clause as unripe but found Carey's facial challenge to the clause ripe for review.  The Court also dismissed Carey's renewed challenges to the Recusal Requirements and to the Endorsement Clause for lack of standing and ripeness.

As a result, the sole claims remaining in this action are Carey's facial challenges to the

---

candidate for judicial office who violates the Code and to refer the judge or lawyer to the KBA for possible suspension or disbarment.  The JCC is charged with investigating allegations of judicial misconduct and, where appropriate, with initiating formal proceedings against a judge or judicial candidate.  SCR 4.170.

Pursuant to SCR 3.130(8.2), "a lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct."  The defendant members of the Kentucky Bar Association Inquiry Commission and the Bar Counsel have certain investigative and disciplinary functions over attorneys admitted to practice in Kentucky, including attorneys seeking judicial office. SCR 3.140 *et seq.*

Commit Clause, the Partisan Activities Clause, and the Solicitation Clause.[8]  Carey and the KBA now each move for summary judgment in their favor on these claims.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## II.     THE COMMIT CLAUSE.

The Commit Clause provides the following:

A judge or candidate for election to judicial office. . .shall not intentionally or recklessly make a statement that a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court.

Rule 4.300 of the Rules of the Kentucky Supreme Court ("SCR"), Canon 5(B)(1)(c).

The Commentary to the Commit Clause states the following:

Section 5(B)(1)(c) prohibits a candidate for judicial office from intentionally or recklessly making a commitment, or creating the appearance of a commitment, to rule in a certain way on cases, controversies or issues likely to come before the court. The section was changed in 2005 to conform to the United States Supreme Court's holding in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), and the federal district court's holding in *Family Trust Foundation of Kentucky v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D.Ky 2004).

An independent judiciary requires judges to be open-minded, in the sense of not pre-judging matters that might come before them. A candidate who promises the electorate to rule in a certain way on a case or matter is in effect saying to the electorate that the judge is "spoken for" on that matter and will not decide it on the facts and law presented at the time the case arises. The electorate has no legitimate

---

[8] In his Complaint, Carey purports to assert both as-applied and facial challenges to the Partisan Activities Clause and the Solicitation Clause.  However, there is no difference between Carey's as-applied and facial challenges.  Accordingly, the Court has construed Carey's Complaint to assert only facial challenges to the Partisan Activities Clause and the Solicitation Clause.

interest in such promises, and candidates may not make them. Candidates may, however, inform the electorate of their judicial and political philosophies and their thinking on points of law so long as the candidates make clear that they will decide matters on the facts and law as presented and developed in the cases that come before them.

The canon applies to those who intend to commit, or create the appearance of a commitment, and those who recklessly create the appearance of a commitment. As used in the canon, recklessly is used as the Supreme Court used the word in *New York Times v. Sullivan*, 376 U.S. 254 and as it is commonly used in the criminal law – a conscious disregard of a substantial and unjustifiable risk that the result will occur. A candidate who makes a public statement that the candidate intends to be taken as a commitment (i.e. "If elected I will never probate a defendant in a drug case") violates the canon. In addition a candidate violates the canon if the candidate knows that the statement may reasonably be perceived as a commitment. (*cf. Kirschner v. Louisville Gas & Electric Co.*, 743 S.W.2d 840 (Ky. 1987). However a candidate who innocently or negligently makes such a statement does not violate the canon. *Summe v. Judicial Retirement and Removal Commission*, 947 S.W.2d 42 (1997), Justice Graves dissenting.

SCR 4.300, Canon 5(B)(1)(c), Commentary.

### A.    *Republican Party of Minn. v. White*, 536 U.S. 765 (2002).

In the Supreme Court case referenced in the Commentary, *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the Court reviewed a judicial canon stating that a "candidate for a judicial office, including an incumbent judge," shall not "announce his or her views on disputed legal or political issues." *Id*. at 768.  The Supreme Court held that the "Announce Clause" violated the First Amendment. *Id*. at 788.

The Court began by noting that, in prohibiting a candidate from *announcing* his views, the clause prohibited "much more than *promising* to decide an issue a particular way. The prohibition extends to the candidate's mere statement of his current position, even if he does not bind himself to maintain that position after election." *Id*. at 770.   The Court also noted that the district court and the Eighth Circuit had construed the clause to reach "only disputed issues that are likely to come

before the candidate if he is elected judge." *Id*. at 771.  However, the Court determined that this limitation was not really a limitation at all because there is really no issue unlikely to come before a court. *Id*. at 772-73.

The Court applied strict scrutiny to the clause, meaning that in order for the clause to survive it had to be narrowly tailored to serve a compelling state interest. *Id*. at 775.  As to the state interest, the state argued there were two at stake: first, preserving the impartiality of the state judiciary in order to protect the due process rights of litigants; and, second, preserving the appearance of judicial impartiality in order to preserve the public confidence in the judiciary.  *Id*.

The Court recognized three definitions for judicial "impartiality." The first was a lack of bias for or against parties to court proceedings. The Court found this form of impartiality was essential to due process.  Thus, the state had a compelling interest in preserving it. 536 U.S. at 775-76 (citing cases finding due process violated where a judge is biased for or against a particular party).  The Court noted that impartiality toward parties guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.  *Id*. at 776.

The Court determined, however, that Minnesota's Announce Clause was barely tailored to serve this interest at all because the clause did not restrict speech for or against particular *parties*, but instead only restricted speech for or against particular *issues*. *Id*. The Court recognized that when a judge takes a position on a legal issue, the party taking the opposite stand is likely to lose but that this was not because of any bias against the *party* itself. *Id*.  Thus, the prohibition against judges announcing their views on legal issues did not promote the state interest in preventing judicial bias against parties.

The Court determined that judicial impartiality could also mean the "lack of preconception

6

in favor of or against a particular *legal* view." *Id.* at 777. The Court determined that this sort of impartiality guarantees litigants "an equal chance to persuade the court on the legal points in their case." *Id.* In the Supreme Court's view, this was not a compelling state interest, however, because it is "virtually impossible to find a judge who does not have preconceptions about the law." *Id.* Since finding such a judge is impossible, preserving the *appearance* of such judges was not a compelling state interest either. *Id.* at 778.

The Supreme Court also recognized a third possible meaning of "impartiality" as "open-mindedness," meaning a judge's "willing[ness] to consider views that oppose his preconceptions, and remain open to persuasion when the issues arise in a pending case." *Id.* at 778. The Court determined that this kind of impartiality guarantees "each litigant, not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so." *Id.* The Court did not decide whether this form of impartiality is a compelling state interest because it determined that the Announce Clause was not adopted for the purpose of preserving judicial open-mindedness or the appearance of the same. *Id.* The state had argued that the clause served this interest because it relieved a judge from the pressure to rule a certain way in order to maintain consistency with his prior statements. *Id.* at 778-79. The Court determined that, if the Announce Clause was aimed at that purpose, it was "woefully underinclusive" because it only prohibited statements made in election campaigns but not any statements that judges may have made before arriving on the bench or while on the bench. *Id.* at 779-80.

Later, in *Family Trust Foundation of Kentucky v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D. Ky 2004), the district court case referenced in the Commentary to the Commit Clause, the court reviewed a "Pledges or Promises Clause" contained in the Kentucky Code of Judicial Conduct which

prohibited judicial candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office." *Id*. at 676. The court also reviewed the prior version of Kentucky's Commit Clause which provided that a judicial candidate "shall not make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." *Id*. The court held that both clauses likely violated the First Amendment because they were "not limited to restricting campaign promises to rule a certain way on issues likely to come before the court." *Id*. at 696-97.

As in *White*, the court determined that neither of the clauses served the important state interest in prohibiting judicial bias against a particular party because they dealt only with particular *issues*. *Id*. at 695. As to the state interest in preserving judicial "open-mindedness" and the appearance of the same, the court determined that the state at least had a compelling interest in preventing "judicial candidates from promising to rule a certain way on cases, controversies or issues likely to come before the court." *Id*. at 695.

The court determined that the problem with the clauses at issue was that they were "not limited to restricting campaign promises to rule a certain way on issues likely to come before the court." *Id*. at 696-97. The pledges and promises clause applied broadly to all promises made during a campaign. *Id*. at 697. The commit clause at the time prohibited any commitment about any issue likely to come before the court, not just commitments to *rule* a particular way on an issue likely to come before the court. *Id*.

The court concluded that "[w]ithout a restriction limiting the two clauses to statements in which a candidate promises to rule a particular way on an issue likely to come before the court," they suffered from "woeful underinclusiveness." *Id*. The court determined that the clauses properly

8

regulated promises to rule a certain way on issues likely to face the court but they also prohibited broad areas of protected speech. *Id*. at 703.

The district court granted the plaintiff's motion for a preliminary injunction. The defendants filed an emergency motion to stay the district court's order with the Sixth Circuit which denied the motion, in part, because it found that the defendants had not demonstrated a substantial likelihood of success on the merits of their claim. *Family Trust Foundation of Kentucky, Inc. v. Kentucky Judicial Conduct Commission*, 388 F.3d 224, 227 (6th Cir. 2004).

As the Commentary to the current Commit Clause makes clear, after *White* and *Family Trust*, the Kentucky Supreme Court revised the Commit Clause with the intent of making it conform to those decisions. The Commit Clause now prohibits a judge or judicial candidate from "*intentionally or recklessly*" making a statement that "a *reasonable person would perceive* as committing the judge or candidate *to rule* a certain way on a case, controversy or issue that is likely to come before the court." SCR 4.300, Canon 5(B)(1)(c)(emphasis added).

## B. The Proper Standard of Review.

Before addressing the constitutionality of Kentucky's revised Commit Clause, the Court must first determine what standard of review applies for each of the clauses at issue in this action. In its Opinion on Carey's Motion for Preliminary Injunction, this Court noted that speech during an election campaign "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995). The proper test to be applied to determine the constitutionality of restrictions on "core political speech" is strict scrutiny. *Id.* at 347. The Court further noted that content-based restrictions are subject to the highest degree of constitutional scrutiny. *Grider v. Abramson*, 180 F.3d 739, 748 (6th Cir. 1999). The Court determined that, because

9

the Partisan Activities Clause and the Solicitation Clause restrict candidates' speech during elections and were content-based restrictions, they should be subject to the highest degree of scrutiny. The same reasoning would apply to the Commit Clause, which also restricts speech based on content during an election.

Under strict scrutiny analysis, the government has the burden of proving that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *White,* 536 U.S. at 774-75. "[I]t is the rare case in which. . . a law survives strict scrutiny." *Burson v. Freeman,* 504 U.S. 191, 211 (1992).

In *White*, the Supreme Court applied the strict-scrutiny test to Minnesota's announce clause. 536 U.S. at 774-75. The JCC argues that the clauses at issue in this action should be subjected to the lesser "intermediate scrutiny." It argues that the Supreme Court applied strict scrutiny in *White* only because the parties did not dispute the issue. *Id.* However, in applying strict scrutiny in *White*, the Supreme Court began by noting that "the announce clause both prohibits speech on the basis of its content and burdens a category of speech that is 'at the core of our First Amendment freedoms' – speech about the qualifications of candidates for public office." *Id*. at 774-75. Under well-established law, such restrictions are subjected to the highest scrutiny. *See, e.g., McIntyre*, 514 U.S. at 346 (speech during an election campaign "occupies the core of the protection afforded by the First Amendment"); *Burson*, 504 U.S. at 196 ("the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office"); *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 223 (1989)("[w]e have recognized repeatedly that debate on the qualifications of candidates is integral to the operation of the system of government established by our Constitution"); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434

10

(2002) (content-based regulation is subject to strict scrutiny).

In their responses, both the KBA and the JCC argue that restrictions on the speech of judges during campaigns should be subjected to less scrutiny than that of legislators and executives because of the uniquely impartial role that judges play in government.[9]  However, in *White,* the Court found that the differences between judicial and legislative elections had been "greatly exaggerate[d]." *Id.* at 784. The Court determined that  "[i]f the State chooses to tap the energy and the legitimizing power of the democratic process [to select judges], it must accord the participants in that process. . . the First Amendment rights that attach to their roles." *White*, 536 U.S. at 788 (quoting *Renne v. Geary*, 501 U.S. 213, 349 (1991)(Marshall, J. dissenting)).  As the Fifth Circuit noted in *Jenevein v. Willing*, 493 F.3d 551 (5th Cir. 2007), where judges are elected to their position, they are no less elected officials about whom the public is obliged to inform itself than are legislators or executives. *Id.* at 557.  *See also Republican Party of Minnesota v. White ("White II")*, 416 F.3d 738, 748-49 (8th Cir. 2005)(applying strict scrutiny to state partisan activities and solicitation clauses), *cert. denied by Dimick v. Republican Party of Minnesota*, 546 U.S. 1157 (2006); *Weaver v. Bonner*, 309 F.3d 1312, 1319 1320-21 (applying strict scrutiny to state solicitation clause and rejecting argument that speech by judicial candidates is entitled to less protection than speech by legislative and executive candidates).

Neither the KBA nor the JCC has cited any case involving restrictions on speech during a campaign in which any test less than strict scrutiny has been applied and this Court has found none.

_____

[9]  In a footnote, the JCC states that "analytically. . . there is some question whether the rationale of *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983),  could be extended to allow a general speech restriction on sitting judges – regardless of whether they are campaigning – in order to promote the efficient administration of justice. . ."  The JCC does not go beyond noting the "question" to present an actual argument and, accordingly, the Court has not analyzed this issue.

The JCC cites *Buckley v. Valeo*, 424 U.S. 1 (1976). However, as the Eighth Circuit explained on remand from the Supreme Court, in *Republican Party of Minnesota v. White (White II)*, 416 F.3d 738 (8th Cir. 2005), *cert. denied, Dimick v. Republican Party of Minn.*, 546 U.S. 1157 (2006), "*Buckley* is a case involving the regulation of the size, source and use of political contributions. It does not deal with the direct suppression of core political speech and association at issue in this case." 416 F.3d at 756 n.8.  The Eighth Circuit further explained that, in *Buckley*, the court used two different standards of review.  "The Court analyzed campaign contributions, and their reasonable limitations, under a 'sufficiently important interest' standard that asked whether the limitations were 'closely drawn to avoid unnecessary abridgement of [political] freedoms.' 424 U.S. at 25. And where the Court actually discussed rights similar to those at issue in this case, it imposed 'exacting scrutiny applicable to limitations on core First Amendment rights of political expression.'*Id*. at 44-45." *Id*.

The KBA argues that both First Amendment rights and Due Process rights are at stake and, thus, the Court should review the clauses under the intermediate standard of review employed by the Supreme Court in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984).  In that case, the *Seattle Times* was a litigant in a case in which the trial court compelled the opposing party to produce certain information during discovery but also entered a protective order prohibiting the *Seattle Times* from disseminating or using the information in any way except as necessary to prepare and try its case. *Id*. at 26-27.

The *Seattle Times* then challenged the protective order as a prior restraint on speech in violation of the First Amendment. The Supreme Court rejected the *Seattle Times*' claim and also rejected the suggestion that review of a protective order requires any heightened scrutiny under the First Amendment. The Court noted that discovery is "a matter of legislative grace" and that litigants

gain access to discovery materials "only by virtue of the trial court's discovery processes." *Id*. at 31-32. The Court determined that a protective order limiting the dissemination of information obtained through civil discovery was "not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Id*. at 33. This was because "the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." *Id*. at 34.

*Seattle Times* does not mandate anything less than strict scrutiny in this action. It does not deal with restrictions on speech during an election. Further, the Supreme Court applied intermediate scrutiny in *Seattle Times* because the entity claiming a violation of its First Amendment rights would not have had the information being restricted by the state in the first place if not for the state compelling its production to the entity. That is not the case with the speech that is being restricted by the clauses at issue in this action.

Next the KBA argues that the Court should apply something less than strict scrutiny to the clauses at issue because they regulate the speech of officers of the court and such speech is less protected than speech by other individuals. While it is true that lawyers are subject to ethics rules, including those limiting their rights under the First Amendment to solicit business and advertise, the KBA has cited no case, and the Court has located none, that applied less than strict scrutiny to restrictions on lawyers' speech as candidates in campaigns.

Because the clauses at issue regulate speech based on content during a campaign, the Court will follow the well-established law that such regulations are subject to strict scrutiny. That does not mean that the unique role that judge's play in government will be lost in the analysis. Strict scrutiny "asks whether the state's purported interest is important enough to justify the restriction" in question.

13

*White II*, 416 F.3d at 750.  In *White,* the Court allowed that, the First Amendment may permit greater regulation of judicial campaigns than legislative campaigns but that such regulations must still pass strict scrutiny review.  *Id.*  at 783.  Assuming, as the Defendants assert, there is a more compelling reason to regulate speech by candidates during a judicial election than other elections, strict scrutiny review will permit greater restrictions on judicial candidates' speech than that of other candidates.

### C.    Analysis.

### 1)    Commitments v. Announcements.

There can be no doubt after *White* that it is unconstitutional to prohibit judicial candidates from simply *announcing* their views on legal and political issues. However, other cases draw a distinction between announcements and commitments by candidates, finding that states can prohibit candidates from *promising to rule* a certain way on cases or issues. *See Family Trust*, 345 F.Supp.2d at 695 ("To the extent that the promises and commit clauses attempt to prevent judicial candidates from promising to rule a certain way on cases, controversies or issues likely to come before the court, the state has a compelling interest in such a restriction."); *Buckley v. Illinois Judicial Inquiry Bd*., 997 F.2d 224, 227 (7th Cir. 1993) ("Two principles are in conflict and must, to the extent possible, be reconciled. Candidates for public office should be free to express their views on all matters of interest to the electorate. Judges should decide cases in accordance with law rather than with any express or implied commitments that they may have made to their campaign supporters or to others."); *Duwe v. Alexander*, 490 F. Supp. 2d 968, 975 (W.D. Wis. 2007)(when a judge commits to an outcome before the case begins, it "renders the proceeding an exercise in futility for all involved," but when a judge merely discloses an opinion or predisposition, it "is nothing more than acknowledgment of the inescapable truth that thoughtful judicial minds are likely to have considered

14

many issues and formed opinions on them prior to addressing the issue in the context of a case").

Carey concedes that the state has at least a "legitimate interest in prohibiting judges or judicial candidates from pledging or promising certain results in particular cases or classes of cases." (Rec. No. 81, Mem. at 10). Commitments by judicial candidates to rule in a particular manner on issues or cases harm the compelling state interests in preserving judicial open-mindedness and the appearance of the same.

In *White*, the Supreme Court did not specifically decide that the state had a compelling interest in preserving judicial open-mindedness or the appearance of the same. However, this Court agrees with those courts that have found this interest to be a compelling one. When deciding cases, a judge must be willing to consider views that are contrary to his own and to remain open to persuasion. Otherwise, the judge is no longer acting as "judge" of the matters before him and the judicial process of discovering evidence, researching legal precedence, and presenting arguments and evidence to the judge will be rendered meaningless. Likewise, if the public comes to perceive judges as officials that are not willing to consider certain views at all and are completely close-minded on particular issues, then judges will no longer fulfill the necessary role of impartial arbiter and the legitimacy and acceptance of their decisions will be undermined.

Promises by judicial candidates to rule in a particular way on issues or cases harms the compelling state interest in preserving judicial open-mindedness. When a judicial candidate commits to ruling a certain way, then he is either actually close-minded on that issue or his commitment will cause him to be because he will feel pressured to rule in the manner he committed to as a judicial candidate. The Court agrees with Carey that prohibiting commitments by judicial candidates to rule in a particular way may not lessen the candidates' actual close-mindedness but it will prevent any

close-mindedness caused by making the commitment.

Commitments by judicial candidates to rule in a particular manner on a *case* harms the

compelling state interest in preventing bias against parties and the appearance of such bias.[10]   In

*White*, the Court determined that the Announce Clause at issue did not harm the state interest in

preventing judicial bias against *parties* because it only addressed announcements regarding *issues*.

However, the Court specifically noted at the outset of the opinion that the clause under review

prohibited candidates from announcing their views on issues and did not prohibit them from

promising to decide issues and cases in a particular way.  536 U.S. at 770.

Unlike the mere announcements of legal views at issue in *White*, when a judicial candidate

promises to rule a particular way on a case, he is expressing bias for or against the individuals or

entities who are the parties in that case. When a judicial candidate commits to ruling particular way

on a case, he is either actually biased against the parties on the losing side of his proposed ruling, or

the commitment itself will cause the candidate to be biased against those parties because he will feel

---

[10]   The KBA argues that the compelling state interests at stake are protecting due process, judicial independence, and public confidence in judicial fairness.  Each of these interests as defined by the KBA is subsumed within the state interests in preserving judicial open-mindedness and prohibiting judicial bias against parties. The KBA defines due process as the right to an impartial and disinterested tribunal. In *White*, the Court  found that the kind of judicial impartiality required for due process is lack of bias for or against particular parties but not lack of bias for or against particular legal views because a "judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice."  536 U.S. at 776-77.  Thus, the state interest in preserving due process is subsumed within the state interest in prohibiting judicial bias against particular parties.

As to the state's interest in an "independent judiciary,"  the KBA defines such independence as the judiciary's "indifference to popularity" and independence from political influences. The KBA argues that judges must do what is right without considering the effect of their decisions on their money contributors or partisan allies. Such considerations would either lead to bias for or against parties or views or to close-mindedness on particular issues. Accordingly, the state interest in an independent judiciary is subsumed within the compelling state interests in prohibiting judicial bias against parties and preserving judicial open-mindedness. Per *White*, there is no compelling state interest in prohibiting judicial bias against particular legal views.

Finally, the state interest in maintaining public confidence in judicial fairness is the same as the state interest in preserving the appearance of an open-minded and unbiased judiciary.

16

pressured to rule as he promised his supporters. The Court recognizes that prohibiting judicial candidates from committing to rule a particular way on a case may not necessarily decrease any actual bias the candidates have against parties.  Prohibiting such commitments will, however, prevent any bias caused by making the commitment itself.

Promises by judicial candidates to rule in a particular manner also harms the compelling state interest in the appearance of an open-minded and unbiased judiciary.  When judicial campaigns are marked by the candidates' promises to rule a certain way on particular issues and cases, then the public perception of judges as unbiased and open-minded will decrease.

For these reasons, it seems clear that commitments by judicial candidates to rule in a particular manner on cases or issues harms the compelling state interest in an open-minded and unbiased judiciary and the appearance of the same.  But Carey's problem with the clause is not that it prohibits candidates from promising to rule a certain way. He argues that it continues to prohibit candidates from simply announcing their views on issues.  (Rec. No. 81, Mem. at 10).

Carey cites various cases that, in the wake of *White*, determined that commit clauses were unconstitutional because they actually prohibited announcements of legal views.  However, there are two important distinctions between the clauses at issue in those cases and Kentucky's Commit Clause.

First, in every case cited by Carey in which the court determined that the commit clause was unconstitutional, the clause, like Kentucky's prior commit clause, prohibited not only commitments by judicial candidates but also statements that "appear to commit" the candidates. Secondly, also like Kentucky's prior commit clause, the unconstitutional clauses were not confined to prohibiting only commitments to *rule* a particular way on issues and cases. *See Kansas Judicial Watch v. Stout*, 440

F. Supp. 2d 1209, 1228 (D. Kan. 2006)(prohibiting statements that "commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court"); *North Dakota Family Alliance v. Bader*, 361 F. Supp. 2d 1021, 1024 (D.N.D. 2005)(same); *Indiana Right to Life, Inc. v. Shepard*, 463 F.Supp.2d 879, 882 (N.D. Ind. 2006) (same), *rev'd on other grounds*, 507 F.3d 545 (7th Cir. 2007); *Alaska Right to Life v. Feldman*, 380 F. Supp. 2d 1080, 1082-83 (D. Alaska 2005)(prohibiting statements that "commit or appear to commit the candidate to a particular view or decision with respect to cases, controversies or issue that are likely to come before the court"), *rev'd on other grounds*, 504 F.3d 840 (2007).

   In contrast, Kentucky's current Commit Clause prohibits a candidate from intentionally or recklessly making a statement that *a reasonable person* would perceive as committing the judge or candidate *to rule* a certain way on a case, controversy, or issue that is likely to come before the court.

   In *Kansas Judicial Review v. Stout*, 519 F.3d 1107 (10th Cir. 2008), the Tenth Circuit explained the potential problem with the "appear to commit" language as follows:

> In addition to actual commitments, the Commits Clause prevents candidates from making statements that "appear to commit" them on issues likely to come before the court. Plaintiffs' argument that the Commits Clause is vague rests primarily on the ambiguous meaning of this phrase. As plaintiffs contend, the term could refer either to a subjective or objective appearance of making a commitment. Content-based restrictions on protected speech that depend upon subjective impressions raise serious constitutional questions. *See, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content neutral basis for regulation."). An objective test, however, might survive constitutional scrutiny, and a state court ruling on the meaning of this phrase could eliminate unconstitutional vagueness.

*Id*. at 1121 (footnote omitted).

   In *Duwe v. Alexander*, 490 F. Supp. 2d 968 (W.D. Wis. 2007), the clause under review prohibited judicial candidates from making "with respect to cases, controversies, or issues that are

18

likely to come before the court, pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of the office." *Id*. at 975. However, the court construed the clause as clearly preventing "an actual commitment to rule a certain way on a case, controversy or issue likely to come before the court." *Id*. The court determined that, so construed, the clause avoided "the successful vagueness, overbreadth, under inclusiveness and over inclusiveness challenges" against other rules. *Id*. at 975-76.

The *Duwe* court also found it significant that the clause did not contain the phrase "appears to commit." The court explained that "the vagueness of that phrase converts the provision into an alternate version of the announce clause condemned by *White*, because while a forceful opinion on an issue may 'appear to commit' someone to an outcome, it is not a true commitment." *Id*. at 976.[11]

Similarly, in *Pennsylvania Family Institute v. Celluci*, 521 F.Supp. 2d 351(E.D. Pa. 2007) the clause under review prohibited judicial candidates from making "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court. . . ." *Id*. at 355. However, the court construed the clause narrowly to prohibit only commitments "to decide an issue or a case in a particular way once elected judge." *Id.* at 375. The court also deleted the phrase, "appear to commit" from the clause, finding the phrase unconstitutionally vague because it allowed the "unpredictable opinions of third parties to determine

---

[11] While in *Duwe*, the court found the commit clause facially constitutional, it determined, based on the state Supreme Court comments to the rule, that there was a possibility that the rule might be unconstitutionally applied to prevent judicial candidates from answering a questionnaire prepared by the plaintiffs. *Id*. at 976. Specifically, the court found that a statement in the comments to the rule prohibiting the candidate from making statements that "may reasonably be viewed as committing" the candidate to leave open the possibility that the rule could be applied in an overbroad manner. *Id*. The court did not state why this language was constitutionally problematic. To the extent that the court determined that this phrase was unconstitutionally vague because it employs a subjective test for determining whether a statement is a commitment to rule a particular way, this Court disagrees. The phrase "may reasonably be viewed" denotes an objective standard.

whether a candidate has violated the clause; deleting that phrase saves the clause from unconstitutionality by subjecting the clause to an objective 'commitment' standard." *Id.* at 380.

This Court need not decide the constitutional significance of the "appear to commit" language, however, because the Kentucky Commit Clause does not contain any such language. Furthermore, assuming that the constitutional infirmity of the "appear to commit" language lies in its potential to be interpreted as establishing a subjective test for whether a judicial candidate has committed to rule a particular way, the Kentucky clause unambiguously establishes an objective commitment standard. Again, the clause prohibits judicial candidates from making a statement "that a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court. . . ." This is not a subjective commitment test as Carey argues.

For these reasons, Kentucky's Commit Clause cannot be read to prohibit judicial candidates from simply announcing their views on disputed legal and political issues as Carey argues. (Rec. No. 81, Response at 10). It prohibits candidates from committing *to rule* in a particular way as measured under an objective standard.

### 2) Vagueness.

Because Kentucky's Commit Clause contains an objective commitment test, the clause is not vague as Carey argues. A law is vague if it is not "sufficiently defined so that ordinary people, exercising ordinary common sense, can understand it and avoid conduct which is prohibited, without encouragement of arbitrary and discriminatory enforcement." *United States v. Salisbury*, 983 F.2d 1369, 1377-78 (6th Cir. 1993).

As the court stated in *Duwe*:

Whether a statement is a pledge, promise or commitment is objectively discernable. It requires affirmative assurance of a particular action. It is a predetermination of the resolution of a case or issue. It is not a statement of belief or opinion. Absent a statement committing the speaker to decide a case, controversy or issue in a particular way, the speaker can be confident that the rule is not violated. . . People are practiced in recognizing the difference between an opinion and a commitment (which explains why politicians typically stop short of the latter). A promise, pledge or commitment typically includes one of those three words or phrases like "I will" or "I will not" Phrases like "I believe" or "It is my opinion" signal the absence of commitment.

*Duwe*, 490 F. Supp. 2d at 975-76; *see also Celucci*, 521 F.Supp.2d at 385-87.

The Court agrees with this analysis and, for the same reasons, finds that Kentucky's Commit Clause adequately defines what conduct is forbidden so that ordinary people, exercising ordinary common sense, can understand it and so that there is no risk of arbitrary or discriminatory enforcement.

### 3)    Underinclusiveness and Overinclusiveness.

Carey argues that the clause is woefully underinclusive in protecting the state interests because, like the announce clause in *White*, it only prohibits statements made during a candidacy but not statements by a lawyer before he announces his candidacy.  However, the distinction between the statements at issue in *White* – "announcements" of a judicial candidates's views of disputed legal and political issues –  and those at issue in this case – commitments to rule a certain way on cases or issues – is important.

In *White*, the state justified prohibiting candidates from announcing their views on legal and political issues on the basis that judicial candidates who make such announcements may feel pressure to rule in accordance with those announcements as judge.  If that was the true purpose of the prohibition, then the ban on announcements made only during a campaign was underinclusive because an individual may feel just as much pressure to rule in accordance with public

announcements he made prior to the campaign.

In contrast, an individual cannot make a meaningful commitment to *rule* in a particular way as judge unless he is a judge or actively seeking to become one.  As the court stated in *Family Trust*, "the only time a *promise to rule* a certain way has any meaning is in the context of a judicial campaign." 345 F. Supp. 2d at 696.  In its effort to protect the impartiality of the judiciary, the state has narrowly tailored the clause to prohibit only commitments to rule a particular way when such promises will directly impact the impartiality of the judiciary and the appearance of the same: during a judicial campaign and by a person seeking to become judge. Accordingly, the clause is not underinclusive.  *See also, Stout*, 440 F.Supp.2d  at 1230; *Celluci*, 521 F.Supp.2d at 384.

Carey also argues that the Commit Clause is overbroad.  Citing *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002), Carey argues that only speech made by judges and judicial candidates with "actual malice" can be prohibited. In that case, the court reviewed a provision which prohibited judicial candidates from negligently making false statements and from making true statements that were misleading or deceptive. *Id*. at 1319.   The court held that  the state could only prohibit  false statements "that are made with knowledge of falsity or with reckless disregard as to whether the statement is false – i.e., an actual malice standard." *Id*.  To the extent that this holding is relevant to a clause prohibiting commitments to rule a particular way, it does not render the Commit Clause overbroad. The Commit Clause does not prohibit candidates from negligently making commitments to rule a particular way.   It only prohibits judicial candidates from intentionally or recklessly committing themselves to rule in a particular manner.

Citing the definition of judicial "candidate" provided in Kentucky's judicial canons, Carey also argues that the Commit Clause is overbroad because it regulates speech by any person who

simply states in public an intent to some day run for judge. The judicial canons define a judicial candidate as:

> [A] person seeking selection for or retention in judicial office by election or appointment. *A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy*, declares or files as a candidate with the election or appointment authority, or authorizes solicitation or acceptance of contributions or support. The term "candidate" has the same meaning when applied to a judge seeking election or appointment to non-judicial office.

SCR  4.300, Terminology (emphasis added).

Thus, the Commit Clause regulates the speech of an individual as soon as he announces he is a judicial candidate.  As explained above, this is precisely the time in which commitments to rule in a particular manner have a meaningful impact on judicial impartiality.

Finally, Carey argues that there are less restrictive means to achieve the state's interest in judicial impartiality than by prohibiting commitments to rule a certain way on issues and cases. Carey argues judicial impartiality is ensured by the election process itself and the judicial temperament.  Carey argues that judges showing partiality will be defeated at the polls.  However, this is likely only true if judges are partial to an unpopular position.  If judges are partial to a position that most of their electorate agrees with, they would likely lower their risks of being rejected at the polls.

As to judicial temperament, Carey argues that judges acquire the skill of nullifying any biases they may have. This may be true of judges that desire that their biases be nullified.  However, where a candidate runs for election on a promise to rule a particular way, then it is at least as likely that the judge will seek to fulfill his promise. Furthermore, if judicial campaigns are filled with promises to rule way one or another upon election – whether those promises are ultimately broken or not – the public perception of judges as unbiased and open-minded arbiters of civil and criminal disputes will

be damaged.  As the court stated in *Family Trust*, "[a] campaign promise to rule a certain way on a legal issue likely to face the court is. . . uniquely destructive of open-mindedness and confidence in the judiciary." 345 F. Supp. 2d at 702 n.12.

Finally, Carey argues that the Commit Clause may actually cause distrust of the judiciary because all voters know that all judicial candidates have views on disputed legal or political issues and, thus, the candidates' silence may appear as deceit.  As discussed, however, the clause does not prohibit judicial candidates from discussing their views on disputed issues.  It prohibits them from committing to rule a particular way.   While voters may expect that judges have views, they do not expect that judges are committed to ruling in a particular way regardless of the evidence or legal argument yet to be presented to them. Accordingly, prohibiting judicial candidates from committing to rule a particular way on an issue or case will not increase voter distrust of judges.  To the contrary, commitments by judicial candidates to rule a particular way will decrease public confidence in the judiciary.

For all these reasons, the Court finds the Commit Clause is narrowly tailored to achieve the state's compelling interest in preserving an unbiased and open-minded judiciary and the appearance of the same.

## III.     THE SOLICITATION CLAUSE.

Kentucky's Solicitation Clause provides that:

A judge or a candidate for judicial office shall not solicit campaign funds, but may establish committees of responsible persons to secure and manage the expenditure of funds for the campaign  and to obtain public statements of support for the candidacy.

SCR 4.300, Canon 5(B)(2).

In *White II*, the Eighth Circuit struck down as unconstitutional Minnesota's solicitation

24

clause. 416 F.3d at 764-66. However, in that case, the plaintiffs challenged the clause only insofar as it prohibited him from personally soliciting contributions from large groups and from signing letters soliciting campaign funds. *Id*. at 764-65.  Accordingly, the court's analysis is not directly applicable to Kentucky's Solicitation Clause.  The court ultimately determined that the provisions were not narrowly tailored to serve the state interest in preventing bias for or against a party or in promoting judicial impartiality.  This was because the clause also prohibited the committee  from disclosing to the candidate those who contributed or those who rebuffed the solicitation.  *Id*. at 765-66.  Thus, where candidates personally solicited funds from large groups or signed solicitation letters, candidates would have no way of knowing who ultimately responded to the solicitation. *Id.* Because it is not the solicitation but knowledge of the response that would cause any partiality, the prohibition on soliciting funds from large groups or signing solicitation letters was not necessary to preserve judicial impartiality.

Solicitation clauses were also found unconstitutional in *Stout*, 440 F. Supp.2d at 1237 and in *Weaver*, 309 F.3d at 1322-23. In both cases, the courts indicated that diminished public confidence in the judiciary is inevitable where judges are elected and, thus, must engage in fundraising.  *Stout*, 440 F. Supp. 2d at 1237 (quoting *White*, 536 U.S. at 791 (O'Connor, J. concurring)); *Weaver*, 309 F.3d 1312 at 1322 ("[t]he impartiality concerns, if any, are created by the State's decision to elect judges publicly").  Nevertheless, in both cases, the court also determined that permitting judges to personally solicit campaign contributions would not necessarily result in partial judges.  *Stout*, 440 F. Supp. 2d at 1237; *Weaver*, 309. F.3d at 1322.

In *Weaver*, the court further noted that, even if there is a risk that judges will be tempted to rule a particular way because of a contribution, the risk is not significantly reduced by allowing the

25

candidate's agent to seek contributions on his behalf instead of the candidate himself. "Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support." *Id*. at 1322-23.

In contrast, in *Simes v. Arkansas Judicial Discipline and Disability Comm'n*, 247 S.W.3d 876 (Ark. 2007), the Arkansas Supreme Court upheld that state's solicitation clause, finding that allowing a judge to personally solicit or accept campaign contributions had the possibility of making a judge feel obligated to favor certain parties in a case and would also make the solicitee fear retaliation for failure to contribute. *Id*. at 585. The court found that a judicial candidate's direct solicitation or acceptance of contributions harmed the state's compelling interest in a "fair and impartial judiciary." *Id*. at 588. "We do not believe anyone can seriously argue that a judge personally soliciting campaign contributions from attorneys having cases before him or her should be permissible." *Id*.

It is important to note that Kentucky's Solicitation Clause does not prohibit solicitation of attorneys who have cases before the judge or any other kind of solicitation. It simply requires that any solicitation be done by the judge's agent instead of by the judge himself. The issue is whether that requirement is narrowly tailored to preserve the state's interest in an impartial and unbiased judiciary and the appearance of the same.

In its opinion on Carey's Motion for Preliminary Injunction, this Court determined that Kentucky's Solicitation Clause was likely unconstitutional for the following reasons:

> The Defendants argue that the Solicitation Clause serves the compelling state interest of ensuring the judiciary's actual impartiality to parties and the appearance of impartiality to parties. (Rec. No. 18, JCC Response at 25; Rec. No. 19, KBA Response at 29). The Defendants may argue that the Solicitation Clause serves this interest because it prevents judges from actually favoring those parties who contribute money to their campaigns. Even with the prohibition against direct

solicitations, however, judges are able to find out who contributed to their campaigns and the amounts they contributed. Thus, if a judge is predisposed to favoring those parties who agree to make contributions, the Solicitation Clause's prohibition against personal solicitation does not prevent such actual partiality.

Additionally, the clause does not serve the state's interest in preserving the appearance of judicial impartiality. If the public does not believe that elected judges favor their contributors, then the committee serves no purpose in preserving that appearance of impartiality. If, on the other hand, the public believes that elected judges favor their contributors, then the fact that contributions are solicited by a committee instead of the judge himself does nothing to dispel that perception. In fact, many members of the general public are likely unaware that judges are not permitted to personally solicit contributions to their campaigns. Those who are aware of the prohibition are likely also aware that, despite the prohibition, judges can still find out who contributed to them and who did not. Thus, the ban on personal solicitation does nothing to preserve the appearance of judicial impartiality.

The Defendants argue that the ban on personal solicitation of contributions serves the state's interest in protecting the actual and apparent impartiality of judges because it precludes one-on-one contact between the judge and potential donor. The JCC argues that the prohibition against personal solicitation "preclude[s] the potential intimidation of the direct solicitation." (Rec. No. 18, JCC Response at 25). The KBA further asserts that it is the "direct contact between the candidate and potential donors that is the problem" because this is the moment when "the coercive effect" of the solicitation is "at its most intense." (Rec. No. 19, KBA Response at 30).

This Court finds no compelling state interest in prohibiting speech that makes it easier for potential donors to "just say no." While such a prohibition may reduce the solicitee's discomfort in refusing a personal solicitation, it does not prevent the judge from identifying those who refuse to contribute to his campaign. Because non-contributors can easily be identified either directly by committee members or indirectly through a process of elimination, a solicitee's fear of disfavor cannot be significantly reduced by solicitations through committees rather than by candidates.

Furthermore, it cannot be said that the ban on direct solicitations reduces the potential for corruption because it eliminates that moment when a judicial candidate can say, "contribute money to my campaign and I will rule in your favor" or "if you don't contribute to me, I'll never rule in your favor." It is true that requiring a committee to solicit campaign contributions prohibits such direct shakedowns by a corrupt judicial candidate. Such blatantly corrupt activity, however, is most certainly already prohibited by the Canon requiring that a judge or judicial candidate "maintain the dignity appropriate to judicial office" as well as by various criminal statutes. SCR 4.300, Canon 5(B)(1)(a). Further, if the provision is aimed at preventing direct

27

solicitations that amount to extortion, then the prohibition against all personal solicitations for campaign contributions is overbroad.

Because the Solicitation Clause does not serve the state's interest in preserving the actual or apparent impartiality of the elected judiciary, the clause is unconstitutional.

*Carey v. Wolnitzek*, 2006 WL 2916814 at * 18-19 (E.D. Ky. 2006).

In their response briefs, the Defendants continue to argue that when a judicial candidate directly solicits contributions, it is more likely to appear to be "a demand for a quid-pro-quo;" is actually more coercive; and is more likely to cause the public to believe that justice is for sale than where the solicitation is done by a committee.  The Defendants submit the affidavits of various former Kentucky state court judges and justices who agree with these assertions.

It may well be that a solicitee will perceive a solicitation to contribute to a judge's campaign to be a demand for a quid pro quo, especially where the solicitee has a case pending before the judge. However, that perception will not be appreciably diminished where the solicitation is made by the judge's agent instead of the judge. It may also be more difficult for a solicitee to decline to contribute where the judge makes the solicitation himself rather than through an agent.  However, the state does not have a compelling interest in simply making it more comfortable for solicitees to decline to contribute to judicial campaigns.

In support of their argument that direct solicitations will increase the public perception that "justice is for sale," the Defendants cite surveys showing that judicial campaigns have become more expensive and that, as a result, judicial campaigns solicit more contributions. However, the solicitation committee requirement does nothing to decrease the funds needed to run a judicial campaign or the amount of funds that can be solicited.  The Defendants also cite a poll showing that 71 percent of Kentuckians are at least somewhat concerned that the efforts of special interest groups

28

to pressure judicial candidates will undermine the fairness and impartiality of Kentucky courts. However, again, the Solicitation Clause does nothing to alleviate any concern about the influence of special interest groups on Kentucky's judges.

The Defendants cite polls showing that the majority of Americans fear that campaign contributions influence the decisions of state judges. These polls seem to confirm Justice O'Connor's belief that diminished public confidence in judicial impartiality is inevitable in a system where judges and judicial candidates depend upon financial contributions. *White*, 536 U.S. at 790 (O'Connor, J., concurring)("the mere possibility that judge's decisions may be motivated by the desire to repay campaign contributors is likely to undermine the public confidence in the judiciary"). While the polls may show that the public believes campaign contributions influences judicial decisions, they do not show that a solicitation committee decreases that perception.

The JCC  also argues that the solicitation committee requirement seeks to prevent the corruption of judges who may not otherwise become corrupt. The Court assumes that the JCC means that the clause seeks to eliminate any moment where a judge could actually demand payment for favorable rulings.  As the Court stated in its prior Opinion, however, there are already judicial canons and various criminal statutes which should serve to deter judges from such extortion.

It may well be, as the court stated in *Simes*, that nobody could seriously argue that a judge soliciting campaign contributions from attorneys having cases before him should be permissible. However, requiring that the judge's agent make the solicitation rather than the judge himself does not appreciably lessen the damage caused by such solicitations to the state's interest in an impartial and open-minded judiciary or the appearance of the same.

For these reasons and those stated in the Court's Opinion on Carey's Motion for Preliminary

29

Injunction, the Court continues to find that the Solicitation Clause is not narrowly tailored to serve the state's interest in preserving the actual or apparent impartiality of the elected judiciary.[12]

## IV.    THE PARTISAN ACTIVITIES CLAUSE.

Kentucky's Partisan Activities Clause provides, in pertinent part, that:

A judge or candidate shall not identify himself or herself as a member of a political party in any form of advertising or when speaking to a gathering. If not initiated by the judge or candidate for such office, and only in answer to a direct question, the judge or candidate may identify himself or herself as a member of a particular political party.

SCR 4.300, Canon 5A(2).

In *White II*, the Eighth Circuit considered the constitutionality of Minnesota's partisan activities clause which provided that judicial candidates could not "identify themselves as members of a political organization, except as necessary to vote in an election. . . attend political gatherings; or seek, accept or use endorsements from a political organization." 416 F.3d at 745. The court determined that the clause was not narrowly tailored to serve the state's interest in preventing judicial partiality toward *parties*. Instead it was aimed at keeping judges from aligning with particular *views* on issues by keeping them from aligning with a particular political party associated with those views. *Id*. at 754. The Eighth Circuit further determined that, even where the political party was a litigant before a judge, a judge's impartiality could not be questioned simply because he was a registered member of that political party or an opposing one. *Id*. at 755. Further, the court determined that, in those political cases where a judge is more personally involved than simply being

_____

[12] In his Complaint, Carey also asked the Court to find unconstitutional an advisory opinion by the Judicial Ethics Committee which was issued on April 1, 1998 (Advisory Opinion JE-92) regarding the Solicitation Clause. That opinion simply states, as the clause itself does, that a Committee must be appointed by a judicial candidate if she or she intends to solicit money. Further, this Court has found the Solicitation Clause to be unconstitutional. Accordingly, any advisory opinion interpreting it is moot. Thus, the Court will deny as moot Carey's Motion for Summary Judgment on his claim that Advisory Opinion JE-92 is unconstitutional.

a member of a political party, then recusal is a less restrictive means of ensuring the lack of bias toward a party. *Id*. at 755.

The Eighth Circuit also rejected the argument that the clause was intended to serve the state interest in judicial "open-mindedness." *Id*. at 756. The court determined that the clause was "woefully underinclusive" if preserving judicial open-mindedness was the intent because it only prohibited a judicial candidate from associating with a political party during a campaign, "though he may have been a life-long, active member of a political party (even accepting partisan endorsements for nonjudicial offices) up until the day he begins his run for a judicial seat." *Id*. at 758. "The few months a candidate is ostensibly purged of his association with a political party can hardly be expected to suddenly open the mind of a candidate who has engaged in years of prior political activity." *Id*.

Further, as to the state's interest in preserving the *appearance* of judicial open-mindedness, the court held that the clause was even less tailored to serving this interest because, "[i]f, as the Supreme Court [in *White I*] has declared, a candidate may *speak* about her views on disputed issues, what appearance of 'impartiality' is protected by keeping a candidate from simply *associating* with a party that espouses the same or similar positions on the subjects about which she has spoken?" *Id*. "Moreover. . . cabining a candidate from a political party for the relatively short duration of a campaign would add nothing to an appearance of impartiality." *Id*. Thus, the Eight Circuit determined, it was clear that judicial open-mindedness was not the purpose for the state's partisan activities clause. *Id*.

The Eighth Circuit also noted that the state had not "bothered to enact a regulation that guards the interest from all significant threats." *Id*. at 759. The court noted that the clause only

31

restricted judicial candidates' activities with political parties while "associating with an interest group, which by design is usually more narrowly focused on particular issues, conveys a much stronger message of alignment with particular political views and outcomes." *Id*. at 759-60.  Because the clause still permitted "appreciable damage" to the state's supposed vital interest in judicial openmindness, the court rejected the suggestion that the state could view that interest as one of the "highest order."  *Id*. at 760

In its Opinion on Carey's Motion for Preliminary Injunction, this Court found the Partisan Activities Clause was likely unconstitutional for the following reasons:

> The clause does not restrict speech for or against particular litigants, but only restricts speech identifying a judicial candidate as a member of a political party. To the extent that the prohibition is intended to prevent partiality toward a particular legal view or the appearance of such partiality, under *White I*,  this Court cannot find a compelling state interest. Finally, if the goal is to ensure judicial open-mindedness and the appearance of the same, the clause is underinclusive.  It merely prohibits a judicial candidate from identifying his political party and does nothing toward assuring the actual open-mindedness of the candidate.

> As to the appearance of open-mindedness, the clause only prohibits the candidates from identifying their political party during the campaign. The political party affiliations of many candidates, however, are well known prior to the election. Even during and after the election, the political party affiliation of all candidates is readily discoverable through public records. Further, the clause permits a candidate to state his political party affiliation when asked.  Thus, the clause does not nothing toward ensuring the apparent open-mindedness of the judiciary.

> In attempting to justify the Partisan Activities Clause on the basis of a state interest in judicial impartiality, the Defendants also argue that the clause serves the state's interest in nonpartisan elections as mandated by the state constitution and the state's interest in preserving the actual and apparent independence of judges.  The Defendants do not, however, explain what they mean by "nonpartisan" election or judicial "independence."

> If a "nonpartisan" election simply means an election in which the candidates are not nominated by political parties and their political party affiliation does not appear beside their name on the ballot, preventing a judicial candidate from revealing his political party clearly does not serve this interest.  Permitting a candidate to reveal

his political party in advertisements, speeches and discussions will not change the nominating structure of the election or appearance of the ballot. If a "nonpartisan" election means an election in which no one knows the political party affiliation of the candidate, then the Partisan Activities Clause is woefully underinclusive because, as explained above, the political party of the candidate is a matter of public record and is easily discoverable by various means including asking the candidate. If a "nonpartisan" election means an election in which the political parties do not fund or endorse a candidate, the Partisan Activities Clause is not tailored to prevent that activity at all. The Court notes that the clause goes further than simply preventing a candidate from revealing his political party in a manner that implies that party's endorsement. Instead, it broadly bars a candidate from identifying his political party in even the most casual of circumstances unless he is asked.

        For the same reasons, the Court concludes that the Partisan Activities Clause is not narrowly tailored to serve the state's interest in preserving the independence of the judiciary from political parties or the appearance of the same. If the actual or apparent independence of the judiciary is preserved when no one knows the political party affiliation of the candidate, then the Partisan Activities Clause is woefully underinclusive because the political party of the candidates is easily discoverable and often widely known. If the actual or apparent independence of the judiciary is preserved when political parties are prevented from funding or endorsing judicial candidates, the Partisan Activities Clause does not prevent that activity at all.

*Carey*, 2006 WL 2916814, at * 21 - 22.

In their response briefs on Carey's Motion for Summary Judgment, the Defendants makes clear that the clause is not intended to prevent the association of judges with certain views. In fact, the JCC argues that membership in a party does not even necessarily say anything about one's views. Instead, the Defendants assert that the clause is intended to serve the state interest in preventing bias for or against the political parties themselves.

The Defendants argue that the clause is intended to prohibit the appearance of partiality and actual partiality in those cases where a political party, or possibly a high-profile member of the political party, is actually a litigant or where a political party has a direct interest in the outcome. The Defendants submit the affidavits of former Kentucky state judges and justices who state they presided over a number of such cases.

But, if a judge is inclined to rule for his political party, the clause does nothing to prohibit that activity.  If, as the JCC asserts,  the fear is that a judge will be biased against his own party in order to avoid the appearance of impropriety, the clause does not prevent the public from knowing the political party of judges or judicial candidates. Such information is readily discoverable and likely will be in a high-profile political case. Further, such information is often well known before a judge gets on the bench.

For the same reasons, the clause does not prohibit the appearance of judicial bias toward or against a political party.  The clause does not prohibit the public from knowing the party identity of judicial candidates.  Furthermore, in cases where a political party has an interest in the outcome, the simple fact that the presiding judge is a member of a particular party should not by itself reasonably cause a perception of judicial bias.  *See White II*, 416 F.3d at 755.

In its response brief, the KBA argues that if candidates are permitted to announce their political party, there is a risk that voters will vote for or against them solely on that basis.  The KBA argues that voters are increasingly polarized into more disparate political parties and that polls show voters feel "dramatically uneducated" about judicial candidates.  In combination, the KBA argues that there is a risk that voters will cast their votes based solely on a judicial candidate's political identity rather than on the candidate's qualifications for judge.

However, if the goal is to prevent voters from voting for judges solely on the basis of one characteristic– the candidate's party affiliation – then there are less restrictive means of achieving this goal than preventing voters from even knowing this one characteristic.  If the state's goal is to ensure that voters make informed choices, instead of restricting a candidate's speech, the better answer is to increase the information available to the voting public. Furthermore, post-*White*, judicial

34

candidates are permitted to discuss their views on legal and political issues. Thus, if candidates are permitted to identify their party, that will not be the only information voters have to guide their choices.

For all these reasons, and those discussed in the Court's Opinion on Carey's Motion for Preliminary Injunction, the Court finds that the Partisan Activities Clause is not narrowly tailored to serve the state's interest in the actual or apparent impartiality of the judiciary.[13]

## V.   CONCLUSION.

For all these reasons, the Court hereby ORDERS as follows:

1)   The Plaintiff's Motion for Summary Judgment (Rec. No. 81) is GRANTED in part and DENIED in part.

   a)   the Plaintiff's Motion for Summary Judgment is GRANTED as to his challenges to the Solicitation Clause and the Partisan Activities Clause; and the Court DECLARES that those clauses violate the First Amendment of the U.S. Constitution; and

   b)   the Plaintiff's Motion for Summary Judgment is otherwise DENIED; and

2)   The KBA's Motion for Summary Judgment (Rec. No. 93) is GRANTED in part and DENIED in part.

   a)   The KBA's Motion for Summary Judgment is GRANTED as to the Plaintiff's challenge to the Commit Clause and that claim is DISMISSED against the KBA; and

   b)   the KBA Defendants' Motion for Summary Judgment is otherwise DENIED; and

---

[13]   In his Complaint, Carey also asked the Court to find unconstitutional an advisory opinion by the Judicial Ethics Committee which was issued on April 30, 2004 (Advisory Opinion JE-105) regarding the Partisan Activities Clause.  That opinion states that a candidate cannot identify himself as a member of a specific political party in response to a direct question asked by the press during a television interview in front of an audience. Because the Court has found the Partisan Activities Clause to be unconstitutional, any advisory opinion interpreting it is now moot.  Accordingly, the Court will deny as moot Carey's Motion for Summary Judgment on his claim that Advisory Opinion JE-105 is unconstitutional.

3)      Carey's Motion for a Hearing (Rec. No. 98) is DENIED.

Dated this 15th day of October, 2008.

Signed By:

**Karen K. Caldwell**

**United States District Judge**